United States District Court
Southern District of Texas
FILED

JUL 3 1 2003

Michael N. Milby
Clerk of Court

UNITED DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE, DIVISION

| | | |
|---|---|---|
| JUANITA BLANCO; RUBEN GARCIA; | § | |
| NICOLAS RODRIGUEZ; and | § | CIVIL ACTION NO. B-03-119 |
| HERMELINDA QUIROGA, Individually | § | |
| and on Behalf of The Estate of MARIA | § | |
| INEZ RUIZ, | § | |
| Plaintiffs | § | |
| | § | (Removed from the 197th Judicial |
| v. | § | District Court of Willacy County, |
| | § | Texas) |
| PFIZER, INC.; WARNER-LAMBERT | § | |
| COMPANY, now known as PFIZER, INC.; | § | |
| INC.; RAJIV FINGA, M.D.; MARK | § | |
| EDWARDS, M.D.; GEORGE CANTU, | § | |
| M.D.; ALLEN B. SPENCE, M.D.; and | § | JURY DEMANDED |
| WATSON'S CITY DRUG, | § | |
| Defendants | § | |

## MOTION FOR REMAND TO STATE COURT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME **JUANITA BLANCO; RUBEN GARCIA; NICOLAS**

**RODRIGUEZ; and HERMELINDA QUIROGA, Individually and on Behalf of The**

**Estate of MARIA INEZ RUIZ,** Plaintiffs herein, to file this Motion for Remand to State

Court, and in support thereof would respectfully show unto this Court each of the

following matters:

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 1 of 18 pgs.

I.

The Plaintiffs in this case have suffered liver injuries brought about by the use of Rezulin, which was a medication used to treat diabetes. Rezulin was available only by prescription and has since been removed from the market due to its liver toxicity.

Defendants Warner-Lambert Company and Pfizer, Inc. (the "Removing Defendants") removed this action to this Court on the sole basis of their allegation that Defendant Watson's City Drug, the pharmacy where Plaintiffs Juanita Blanco, Nicolas Rodriguez, and Maria Inez Ruiz purchased Rezulin, and Defendants Rajiv Sinha, M.D.(wrongfully named as Rajiv Finga, M.D.), Mark Edwards, M.D., George Cantu, M.D., and Allen B. Spence, M.D. (the "Physician Defendants"), the physicians who prescribed Rezulin to the Plaintiffs, are fraudulently joined in this case. The evidence presented by the Plaintiffs in this Motion will show that the contentions of the Removing Defendants are incorrect.

II.

## Dr. Rajiv Sinha, Dr. Mark Edwards, Dr. George Cantu, and Dr. Allen B. Spence are Not Fraudulently Joined

The Plaintiffs' claims against Dr. Rajiv Sinha, Dr. Mark Edwards, Dr. George Cantu, and Dr. Allen B. Spence are, in part, medical malpractice claims governed by Article 4590i of the Texas Revised Civil Statutes. A copy of that statute is attached

---

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 2 of 18 pgs.

hereto as Exhibit 1 to the Affidavit of David Casso, which is itself attached to this Motion

as Attachment A. According to that statute, Plaintiffs were obligated to provide the

Physician Defendants with written notice of the claims they intended to make against

them prior to filing suit. Article 4590i, Section 4.01. This was accomplished in letters

dated on or about March 21, 2002, signed by plaintiffs' counsel and received by the

Physician Defendants on or about March 22, 2002. See Exhibits 2, 3, 4, and 5.

A.    **The Plaintiffs' Pleadings are Sufficiently Specific**

As an initial matter, it should be noted that on the date the Removing Defendants

filed their Notice of Removal with the Clerk of this Court (July 1, 2003), the Plaintiffs'

live pleading in the state court was the Plaintiffs' First Amended Petition. This pleading

was filed in the state court on June 30, 2003, bears a file-mark of the District Clerk of the

state court dated June 30, 2003, was served on counsel for the Removing Defendants on

June 30, 2003, and is attached hereto as Exhibit 6. It is axiomatic that removability is

determined from the record before the state court at the time the notice of removal is filed

in federal court. Kaplan v. Missouri Pacific Railroad Company, 629 F.2d 337 (5th Cir.

1980); United Food and Commercial Workers Union, Local 919, AFL-CIO v.

Centermark Properties Meriden Square, Inc., 30 F.3d 298 (2nd Cir. 1994). See also 14B

Wright & Miller §3723, at 568. Therefore, the references herein to the Plaintiffs'

pleadings will be to their First Amended Petition, in contrast to the Removing

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 3 of 18 pgs.

Defendants' references only to their Original Petition.  Indeed, the Original Petition was superseded by the First Amended Petition and "shall no longer be regarded as a part of the pleading in the record of the cause . . . . Tex. R. Civ. P. 65; see also Tex. R. Civ. P. 62. Therefore, the Removing Defendants' citations to the Plaintiffs' Original Petition and reliance thereon are nugatory.

An examination of Section X of the Plaintiffs' First Amended Petition shows that the Plaintiffs have pled their claims against Dr. Rajiv Sinha, Dr. Mark Edwards, Dr. George Cantu, and Dr. Allen B. Spence correctly under Texas law. Under Texas caselaw, the Plaintiffs must prove four elements against the Physician Defendants:  (1) a duty by the physician, (2) a breach of that duty, (3) an injury, and (4) a causal connection between the breach and injury. Those four elements are pled by the Plaintiffs in the section cited above.  Specifically, they pled that they took Rezulin between 1997 and 2000, that Dr. Rajiv Sinha, Dr. Mark Edwards, Dr. George Cantu, and Dr. Allen B. Spence had a duty to possess and use that degree of skill and learning ordinarily used under the same or similar circumstances by members of their profession with respect to Plaintiffs; that between 1997 and 2000 they breached this duty and committed the following acts and omissions of negligence which resulted from their failure to meet these standards of due care, skill, and practice required by members of their profession (particulars a-c omitted); that Plaintiffs were caused to sustain severe and permanent liver injuries; and that the injuries

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 4 of 18 pgs.

were a direct and proximate result of the aforementioned negligence. Exhibit 6, secs. IV and X.

It should be noted that Texas is a "fair notice pleading" state; i.e., a petition is sufficient under Texas law so long as it gives fair notice of the facts upon which the plaintiff bases his claim. Tex. R. Civ. P. 47(a); Roark v.Allen, 633 S.W.2d 804 (Tex. 1982). Even if an element of a cause of action is not alleged, the petition should be upheld so long as a cause of action may be reasonably inferred from what is specifically stated. Boyles v. Kerr, 855 S.W.2d 593 (Tex. 1993). Therefore, the Plaintiffs in the case at bar submit that Texas law will allow them to recover damages against Dr. Rajiv Sinha, Dr. Mark Edwards, Dr. George Cantu, and Dr. Allen B. Spence based on their pleadings cited above.

B.    **Dr. Rajiv Sinha's, Dr. Mark Edwards', Dr. George Cantu's, and Dr. Allen B. Spence's Standard of Care**

Additionally, the Physician's Desk Reference (PDR) provides guidance to physicians concerning their prescription and use of medications, including Rezulin.

Attached hereto as Exhibit 7 is a copy of the PDR prescribing information relating to Rezulin believed to be in effect during the time Plaintiffs were taking the drug. An examination of that labeling shows that the Removing Defendants made recommendations that certain blood tests be performed by the prescribing physician at the beginning

---

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 5 of 18 pgs.

of therapy, monthly for the first six months of therapy, every two months for the

remainder of the first year, and periodically thereafter. It was also recommended that liver

function tests be obtained for patients at the first symptoms suggestive of liver problems,

and recommended that Rezulin not be used in patients who exhibit evidence of active

liver disease. Finally, it was recommend that Rezulin be discontinued if the patient had

signs or symptoms suggestive of liver injury. Whether Dr. Sinha, Dr. Edwards, Dr.

Cantu, and Dr. Spence complied with these prescribing guidelines promulgated by The

Removing Defendants is being investigated by consultants on the Plaintiffs' behalf.

C.    **No Dismissal Motions Filed by the Physician-Defendants**

The Physician Defendants, whom the Removing Defendants allege are

fraudulently joined, have not filed any motion to dismiss themselves from this action.

Judge Lewis A. Kaplan, the Judge presiding over the consolidated federal Rezulin MDL

proceedings, has previously ruled in the remand context that the lack of a motion by the

physician "is an objective barrier to any dismissal by the Court." In re Rezulin Prods.

Liab. Litig., 168 F. Supp 2d 136, 150, (S.D. N.Y. 2002) ("Rezulin II"). Because the

physicians in Rezulin II had not moved for dismissal, Judge Kaplan held that "there is a

possibility that Plaintiffs could recover against the physicians in those cases. The motions

to remand those cases will be granted." Rezulin II, 133 F. Supp. 2d at 150. The same

result should obtain here because the Physician Defendants have not filed motions to

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 6 of 18 pgs.

dismiss, and because the plaintiffs have not been afforded with notice of such motions and an opportunity to be heard thereon.

D.   **No Irreconcilable Conflict in Plaintiffs' Claims**

Notwithstanding the Removing Defendants' broad-brush, conclusory statements in their Notice of Removal, based on the allegations in Plaintiffs' First Amended Petition there is no irreconcilable conflict between the Plaintiffs' claims against the Removing Defendants on the one hand and their claims against the Physician Defendants on the other. Specifically, the failure to warn liability theory initially pled by these Plaintiffs was deleted from this action in the Plaintiffs' First Amended Petition. Indeed, inasmuch as this entire "conflict" argument for removal (Notice of Removal, paras. 17, 18, 21, 22, and 23) was based on language from and claims made in the Plaintiffs' original pleading that was superseded by an amended pleading prior to this removal, such argument in support of removal is now moot. Therefore, the Plaintiffs' theories of liability against the Removing Defendants are not in irreconcilable conflict with their theories of liability against Dr. Sinha, Dr. Edwards, Dr. Cantu, and Dr. Spence.

E.   **Breach of Express Warranty Ignored**

The Plaintiffs also alleged that Dr. Sinha, Dr. Edwards, Dr. Cantu, and Dr. Spence were liable for expressly warranting to Plaintiffs that Rezulin was safe, effective, and well

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 7 of 18 pgs.

accepted by patients.  Allegations such as these are properly maintainable against the

Physician Defendants under Texas law.  See <u>Sorokolit v. Rhodes</u>, 889 S.W.2d 239 (Tex.

1994).  Despite these allegations being made by the Plaintiffs against Dr. Sinha, Dr.

Edwards, Dr. Cantu, and Dr. Spence, and despite Texas law specifically authorizing such

claims, the Removing Defendants completely fail to prove that there is no possibility of

the Plaintiffs recovering against Dr. Sinha, Dr. Edwards, Dr. Cantu, and Dr. Spence on

these claims.  Therefore, the Plaintiffs' Motion for Remand to State Court should be

granted.

III.

<u>**Watson's City Drug Is Not Fraudulently Joined**</u>

A.    <u>**The Plaintiffs' Pleadings**</u>

In their Notice of Removal, the Removing Defendants allege that the Plaintiffs'

claims asserted against Defendant Watson's City Drug "must essentially be based on a

'failure to warn' theory of recovery."  Notice of Removal, at para. 26, pgs. 11-12.  The

Removing Defendants are absolutely incorrect in this regard.

A review of the Plaintiffs' live pleading - the Plaintiffs' First Amended Petition -

reveals that the prescriptions of Plaintiffs Juanita Blanco, Nicolas Rodriguez, and Maria

Inez Ruiz were filled at Watson's City Drug located in Raymondville, Willacy County,

Texas.  <u>See</u> Exhibit 6, para. IV.  These Plaintiffs make design defect claims against

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 8 of 18 pgs.

Watson's City Drug as a seller of Rezulin. They also make claims for breaches of the implied warranty of fitness for a particular purpose and the implied warranty of merchantability against Watson's City Drug.  See Exhibit 6, paras. V and VI.

It is long been the law in Texas that the seller of a defective product is strictly liable for damages resulting from such product. Bryan v. John Bean Div. of F.M.C. Corp., 566 F.2d 541, 544 n.3 (5th Cir. 1978); McKisson v. Sales Affiliates Inc., 416 S.W.2d 787, 790 n.3 (Tex. 1967); Shamrock Fuel & Oil Sales Co. v. Tunks, 416 S.W.2d 779, 785-86 (Tex. 1967). This reasoning has also been applied to medical products. Thomas v. St. Joseph's Hospital. 618 S.W.2d 791 (Tex.Civ. App. -- Waco 1980, writ ref'd n.r.e.);  Providence Hospital v. Truly, 611 S.W.2d 127 (Tex. Civ. App.-- Waco 1980, writ dism'd). Similarly, sellers of defective products are potentially liable for breaches of the implied warranty of fitness for a particular purpose and the implied warranty of merchantability.  Garcia v. Texas Instruments. Inc., 610 S.W.2d 456 (Tex. 1980); TEX. BUS & COM. C. § 2.715(b)(2).

B.    **Judge Janis Graham Jack Has Already Ruled**

In the Defendants' Notice of Removal, many cases are cited.  Notably absent from their citations is the ruling of Judge Janis Graham Jack, of the United States District Court for the Southern District of Texas, Corpus Christi Division, in Cause No. C-00-459, styled Rosario Hernandez vs. Pfizer, Warner-Lambert, and H.E.B.  The Hernandez case is

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 9 of 18 pgs.

also a Rezulin case in which the same counsel, both for the Removing Defendants and for

the Plaintiffs, are attorneys in charge. Despite these obvious similarities, the Removing

Defendants wholly fail to apprise this Court of Judge Jack's ruling in apparent violation of

Local Rule 5.3.

Attached to this Motion as Exhibit 8 is a complete copy of Judge Jack's Order

granting the Plaintiff's Motion for Remand. Judge Jack undertakes a painstaking analysis

of the Plaintiff's pleadings, the claims made against H.E.B., and the status of Texas law

on the subject. At pages 13-14 of the Order, Judge Jack held as follows:

> Texas law as it currently stands permits a retailer of an unreasonably
> dangerous product to be held liable under a theory of strict products
> liability. No Texas court has enunciated an exception in the case of a
> pharmacist. Comment k to § 402A of the Restatement (Second) of
> Torts does not provide a blanket exception for sellers of drugs, but
> instead sheds light on when a product is "unreasonably dangerous." The
> Court concludes that [the pharmacy] may, if Plaintiff is able to prove
> the allegations included in her complaint, be held liable; therefore, [the
> pharmacy] is not fraudulently joined.

The instant case is substantially similar to Hernandez. The allegations that

Plaintiffs make here against Watson's City Drug are substantially similar, if not

identical, to those made in Hernandez. A judge in this District has already determined the

issue presented to this Court. This Court should do likewise, and grant Plaintiffs' Motion

for Remand to State Court.

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 10 of 18 pgs.

### C.    The Misjoinder Argument is to No Avail

The Removing Defendants close their Notice of Removal with the following half-

hearted misjoinder argument:

> Only plaintiffs Juanita Blanco, Nicholas Rodriguez and Maria Inez Ruiz are
> alleged to have filled a prescription for Rezulin at Watson Drug.  As such,
> Watson Drug has been misjoined as to Ms. Quiroga (the representative of
> the estate of Ms. Ruiz) because Watson Drug did not fill Ms. Ruiz's
> Rezulin prescriptions.

Notice of Removal, para. 28, at pg. 12.

Plaintiff Hermelinda Quiroga's only involvement in this case is as a representative

of the Estate of Maria Inez Ruiz, and as a wrongful death beneficiary of Mrs. Ruiz.  See

Plaintiffs' First Amended Petiton, secs. II and IV.  It is never alleged that Plaintiff

Quiroga herself took Rezulin.  Yet in the language quoted above the Removing

Defendants first acknowledge that the Plaintiffs allege that Maria Inez Ruiz (now

deceased) did fill her Rezulin prescriptions at Watson's City Drug, and then conclude that

Watson's is misjoined as to Plaintiff Quiroga because Watson did not fill Mrs. Ruiz'

Rezulin prescription.

This argument must fail for at least one of several reasons.  First, it is legal

nonsense that will not support a finding of misjoinder.  Second, no proof has been

presented by the Removing Defendants that tends to show that Mrs. Ruiz' Rezulin

prescriptions were not filled at Watson's.  Finally, the Notice of Removal is fatally

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 11 of 18 pgs.

deficient in this respect (and others), and it can no longer be amended because the 30-day

time period for removal has expired.  28 USC §1446(b).  As such, any misjoinder

argument in this action must either be found invalid or deemed to have been waived.

Lupo v. Human Affairs International, Inc., 28 F.3d 269, 274 (2nd Cir. 1994).

IV.

## Legal Standards for Determining Fraudulent Joinder

A review of pertinent case law from the Fifth Circuit reveals that Removing

Defendants bear a heavy burden in proving that Dr. Sinha, Dr. Edwards, Dr. Cantu, Dr.

Spence and Watson's City Drug were fraudulently joined in this case.  To prove

fraudulent joinder, Warner-Lambert must prove either outright fraud in the Plaintiffs'

recitation of jurisdictional facts, or that there is no possibility that the Plaintiffs will be

able to establish a cause of action against the instate defendants in state court.

Additionally, courts making this determination will evaluate all of the factual

allegations in the Plaintiffs' state court pleadings in the light most favorable to the

Plaintiffs resolving all contested issues of substantive fact in favor of the Plaintiffs.

Courts will also examine relevant state law and resolve all uncertainties in favor of

the non-removing party. Finally, courts do not determine whether the Plaintiffs will

actually or even probably prevail on the merits of the claim, but look only for a possibility

that the Plaintiffs might do so. Indeed, it has even been held that a claim of fraudulent

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 12 of 18 pgs.

joinder must be pleaded with particularity and supported by clear and convincing evidence.

The following cases, which are well known to this Court, stand for and support the preceeding legal principles: Rodriguez v. Sabatino, 120 F.3d 589 (5th Cir. 1997), cert. denied, 118 S.Ct. 1511; Sid Richardson Carbon and Gasoline Co. v. Interenergy Resources. Ltd., 99 F.3d 746(5th Cir. 1996); Ford v. Elsbury, 32 F.3d 931(5th Cir. 1994); Dodson v. Spiliada Maritime Corp., 951 F.2d 40 (5th Cir. 1992); Grassi v. Ciba-Geigy Ltd, 894 F.2d 181(5th Cir. 1990), reh. denied, 899 F.2d 11; Carriere v. Sears, Roebuck and Company, 893 F.2d 98 (5th Cir. 1990), cert. denied, 498 U.S. 817; Laughlin v. Prudential Insurance Co., 882 F.2d 187 (5th Cir. 1989); Green v. Amerada Hess Corp., 707 F.2d 201 (5th Cir. 1983), cert. denied, 464 U.S. 1039; B., Inc. v. Miller Brewing Co., 663 F.2d 545 (5th Cir. 1981); and Parks v. New York Times Co., 308 F.2d 474, 478 (5th Cir. 1962), cert. denied, 376 U.S. 949 (1964).

This Court's standard of review can be summarized thusly: After all disputed questions of fact and all ambiguities in the controlling state law are resolved in favor of the non-removing party, the court determines whether that party has any possibility of recovery against the party whose joinder is questioned.

Using these legal principles and applying the facts of this case thereto leads to the inescapable conclusion that the Plaintiffs have at least a possibility, if not a probability of

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 13 of 18 pgs.

recovery against Dr. Sinha, Dr. Edwards, Dr. Cantu, Dr. Spence, and Watson's City

Drug. Their state court pleadings state valid causes of action against these Defendants,

and those pleadings include each necessary element of each cause of action pled.

For any of the above cited reasons, it is clear that Defendant Warner-Lambert has

not and cannot meet its heavy burden to prove fraudulent joinder of Dr. Sinha, Dr.

Edwards, Dr. Cantu, Dr. Spence, and Watson's City Drug by clear and convincing

evidence in this case. The evidence in the record in this case shows that there is at least a

possibility that the Plaintiffs may recover against them, and that being the case, their

joinder in this case is not fraudulent in fact or in law.

V.

**Conclusion**

When federal subject matter jurisdiction by way of removal is doubtful, the case

should be remanded to state court. Butler v. Polk, 592 F.2d 1293, 1294 (5th Cir. 1979);

Ruffin v. Armco Steel Corp., 959 F. Supp. 770, 772 (S.D. Tex. 1997); Torres v. Southern

Peru Copper Corp, 965 F. Supp 895, 879 (S.D. Tex. 1995). The pleadings and evidence in

this case show that Dr. Sinha, Dr. Edwards, Dr. Cantu, and Dr. Spence are not

fraudulently joined in this case. The Plaintiffs' pleadings in the state court contain each

essential element of their cause of action against the Physician Defendants. Therefore,

this Court cannot conclude based on these facts that there is no possibility of the Plaintiffs

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 14 of 18 pgs.

recovering against them. As such, the joinder of the Physician Defendants in this case is not fraudulent in law or fact.

The pleadings and evidence in this case also show that Defendant Watson's City Drug is not fraudulently joined in this case. It has long been the law in Texas that the seller of a defective product is strictly liable for damages caused by such product, and that sellers of defective products may also be liable for breaches of implied warranties.

Therefore, this Court cannot conclude based on these facts that there is no possibility of the Plaintiffs recovering against Watson's City Drug. As such, Watson's City Drug's joinder in this case also is not fraudulent in law or fact.

**WHEREFORE**, the Plaintiffs in this case respectfully pray that their Motion for Remand to State Court be granted, that this Court remand this case to the 197th Judicial District Court of Willacy County, Texas, and they further pray for such other and further general and special relief to which they may show themselves justly entitled.

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 15 of 18 pgs.

Respectfully submitted,

David Casso
Federal I.D. No.8967
State Bar No.03980250
321 South 12th Street
Post Office Box 2128
McAllen, Texas 78505-2128
Tel.:   (956) 686-9591
Fax.:   (956) 686-9478

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS JUANITA BLANCO; RUBEN GARCIA; NICOLAS RODRIGUEZ; HERMELINDA QUIROGA, Individually and on Behalf of The Estate of MARIA INEZ RUIZ**

**FLORES, CASSO & PETTITT, L.L.P.**
321 South 12th Street
Post Office Box 2128
McAllen, Texas 78505-2128
Tel.:   (956) 686-9591
Fax:   (956) 686-9478

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 16 of 18 pgs.

Michael T. Gallagher
State Bar No.07586000
John H. Kim
State Bar No.00784393
**GALLAGHER, LEWIS, DOWNEY & KIM**
700 Louisiana Street, 40th Floor
Houston, Texas 77002
Tel.:   (713)222-8080
Fax:   (713)222-0066

**OF COUNSEL TO PLAINTIFFS
JUANITA BLANCO; RUBEN GARCIA;
NICOLAS RODRIGUEZ; HERMELINDA
QUIROGA, Individually and on Behalf of
The Estate of MARIA INEZ RUIZ**


## CERTIFICATE OF CONFERENCE

The undersigned hereby confirms that he has attempted to obtain an agreement
from Mr. Jack E. Urquhart, attorney for Defendants, and such attempts have been
unsuccessful to date. Therefore, this Motion for Remand to State Court is opposed.

David Casso

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 17 of 18 pgs.

## CERTIFICATE OF SERVICE

A true copy of this instrument was served in accordance with the Federal Rules of Civil Procedure on all counsel of record on the 31st day of July, 2003.

Mr. Jack E. Urquhart
**BEIRNE, MAYNARD & PARSONS**
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056

Mr. David C. Garza
**GARZA & GARZA**
680 East St. Charles, Suite 300
Brownsville, Texas 78522

Ms. Ann P. Watson
**SHEEHY, SERPE & WARE**
500 Two Houston Center
909 Fannin Street
Houston, Texas   77010-1003

Ms. Philipa M. Remington
**STINNETT, THIEBAUD & REMINGTON**
4800 Fountain Place
1445 Ross Avenue
Dallas, Texas   75202

Mr. Kirk T. Florence
**CROUCH & INABNETT**
1445 Ross Avenue, Suite 2300
Dallas, Texas   75202

_____
David Casso

*Juanita Blanco, et al v. Pfizer, Inc., et al*
Motion for Remand to State Court
pg. 18 of 18 pgs.

UNITED DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE, DIVISION

| | | |
|---|---|---|
| JUANITA BLANCO; RUBEN GARCIA; NICOLAS RODRIGUEZ; HERMELINDA QUIROGA, Individually and on Behalf of The Estate of MARIA INEZ RUIZ,<br>Plaintiffs<br><br>v.<br><br>PFIZER, INC.; WARNER-LAMBERT COMPANY, now known as PFIZER, INC.; INC.; RAJIV FINGA, M.D.; MARK EDWARDS, M.D.; GEORGE CANTU, M.D.; ALLEN B. SPENCE, M.D.; and WATSON'S CITY DRUG,<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. B-03-119<br><br><br>(Removed from the 197th Judicial District Court of Willacy County, Texas)<br><br><br><br>JURY DEMANDED |

## AFFIDAVIT OF DAVID CASSO

THE STATE OF TEXAS    §
                      §
COUNTY OF HIDALGO     §

Before me, the undersigned authority, on this day personally appeared David Casso, known to me to be the person whose name is subscribed to this affidavit and, having been by me first duly sworn, upon his oath stated as follows:

"My name is David Casso. I am over eighteen (18) years of age. I have never been adjudicated to be incompetent. I have personal knowledge of the facts stated in this affidavit and they are true. I am, and at all times during pendency of the above-entitled and numbered

case have been, counsel of record for the Plaintiffs.

Attached hereto as Exhibit 1 is a true copy of Article 4590i of the Texas Revised Civil Statutes.

Attached hereto as Exhibit 2 is a true copy of an Article 4590i notice letter sent to Dr. Rajiv Sinha on behalf of Plaintiff Juanita Blanco.

Attached hereto as Exhibit 3 is a true copy of an Article 4590i notice letter sent to Dr. Mark Edwards on behalf of Plaintiff Ruben Garcia.

Attached hereto as Exhibit 4 is a true copy of an Article 4590i notice letter sent to Dr. George Cantu on behalf of Plaintiff Nicolas Rodriguez.

Attached hereto as Exhibit 5 is a true copy of an Article 4590i notice letter sent to Dr. Allen B. Spence on behalf of Plaintiff Maria Inez Ruiz, Deceased.

Attached hereto as Exhibit 6 is a true copy of Plaintiffs' First Amended Petition, which was served on counsel for the Removing Defendants on June 30, 2003.

Attached hereto as Exhibit 7 is a true copy of the Physician Desk Reference prescribing information relating to Rezulin believed to be in effect at the time the Plaintiffs were taking Rezulin.

Attached hereto as Exhibit 8 is a true copy of Judge Janis Graham Jack's Order of Remand in case No. C-00-459, styled Rosario Hernandez v. Pfizer, Inc., Warner-Lambert Company, now known as Pfizer, Inc.; H.E. Butt Grocery Company, also doing business as H.E.B., Inc., and H.E.B. Food Stores, Inc. in the United States Court for the Southern District of Texas, Corpus Christi Division.

David Casso

SUBSCRIBED AND SWORN to before me on the 31st day of July, 2003, to certify which witness my hand and official seal.

Notary Public in and for the State of Texas

GUADALUPE LOPEZ
MY COMMISSION EXPIRES
July 23, 2006

# Exhibit 1

Art. 4590h–1
Repealed

HEALTH—PUBLIC
Title 71

### Law Review and Journal Commentaries

Durable power of attorney for health care: Texas new legislation. Paul Premack, 53 Tex.B.J. 860 (1990).

## CHAPTER TWENTY–ONE—MEDICAL LIABILITY AND INSURANCE IMPROVEMENT

Article
4590i. Medical Liability and Insurance Improvement Act.

### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Preface.

## Art. 4590i. Medical Liability and Insurance Improvement Act

*Text of article effective until August 31, 2009*

### SUBCHAPTER A. GENERAL PROVISIONS

#### Short Title

Sec. 1.01. This part may be cited as the Medical Liability and Insurance Improvement Act of Texas.

#### Findings and Purposes

Sec. 1.02. (a) The Legislature of the State of Texas finds that:

(1) the number of health care liability claims (frequency) has increased since 1972 inordinately;

(2) the filing of legitimate health care liability claims in Texas is a contributing factor affecting medical professional liability rates;

(3) the amounts being paid out by insurers in judgments and settlements (severity) have likewise increased inordinately in the same short period of time;

(4) the effect of the above has caused a serious public problem in availability of and affordability of adequate medical professional liability insurance;

(5) the situation has created a medical malpractice insurance crisis in the State of Texas;

(6) this crisis has had a material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future;

(7) the crisis has had a substantial impact on the physicians and hospitals of Texas and the cost to physicians and hospitals for adequate medical malpractice insurance has dramatically risen in price, with cost impact on patients and the public;

(8) the direct cost of medical care to the patient and public of Texas has materially increased due to rising cost of malpractice insurance protection for physicians and hospitals in Texas;

(9) the crisis has increased the cost of medical care both directly through fees and indirectly through additional services provided for protection against future suits or claims; and defensive medicine has resulted in increasing cost to patients, private insurers, and the state and has contributed to the general inflation that has marked health care in recent years;

(10) satisfactory insurance coverage for adequate amounts of insurance in this area is often not available at any price;

(11) the combined effect of the defects in the medical, insurance, and legal systems has caused a serious public problem both with respect to the availability of coverage and to the

HEALTH—PUBLIC
Title 71

Art. 4590i

high rates being charged by insurers for medical professional liability insurance to some physicians, health care providers, and hospitals;

(12) the adoption of certain modifications in the medical, insurance, and legal systems, the total effect of which is currently undetermined, may or may not have an effect on the rates charged by insurers for medical professional liability insurance;

(13) these facts have been verified by the Medical Professional Liability Study Commission, which was created by the 64th Legislature.[1]  For further amplification of these facts the legislature adopts the findings of the report of the commission.

(b) Because of the conditions stated in Subsection (a) of this section, it is the purpose of this Act to improve and modify the system by which health care liability claims are determined in order to:

(1) reduce excessive frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical practice systems;

(2) decrease the cost of those claims and assure that awards are rationally related to actual damages;

(3) do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis;

(4) make available to physicians, hospitals, and other health care providers protection against potential liability through the insurance mechanism at reasonably affordable rates;

(5) make affordable medical and health care more accessible and available to the citizens of Texas;

(6) make certain modifications in the medical, insurance, and legal systems in order to determine whether or not there will be an effect on rates charged by insurers for medical professional liability insurance; and

(7) make certain modifications to the liability laws as they relate to health care liability claims only and with an intention of the legislature to not extend or apply such modifications of liability laws to any other area of the Texas legal system or tort law.

Definitions

Sec. 1.03.  (a) In this part:

(1) "Court" means any federal or state court.

(2) "Health care" means any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

(3) "Health care provider" means any person, partnership, professional association, corporation, facility, or institution duly licensed or chartered by the State of Texas to provide health care as a registered nurse, hospital, dentist, podiatrist, pharmacist, or nursing home, or an officer, employee, or agent thereof acting in the course and scope of his employment.

(4) "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

(5) "Hospital" means a duly licensed public or private institution as defined in Chapter 241, Health and Safety Code, or in Section 88, Chapter 243, Acts of the 55th Legislature, Regular Session, 1957 (Article 5547–88, Vernon's Texas Civil Statutes).

(6) "Medical care" means any act defined as practicing medicine in Article 4510, Revised Civil Statutes of Texas, 1925, as amended, performed or furnished, or which should have been performed, by one licensed to practice medicine in Texas for, to, or on behalf of a patient during the patient's care, treatment, or confinement.

(7) "Pharmacist" means one licensed under Chapter 107, Acts of the 41st Legislature, Regular Session, 1929, as amended (Article 4542a, Vernon's Texas Civil Statutes), who, for the purposes of this Act, performs those activities limited to the dispensing of prescription medicines which result in health care liability claims and does not include any other cause of action that may exist at common law against them, including but not limited to causes of action for the sale of mishandled or defective products.

573

Art. 4590i

(8) "Physician" means a person licensed to practice medicine in this state.

(9) "Representative" means the spouse, parent, guardian, trustee, authorized attorney, or other authorized legal agent of the patient or claimant.

(b) Any legal term or word of art used in this part, not otherwise defined in this part, shall have such meaning as is consistent with the common law.

## SUBCHAPTER B. ADDITIONAL DISCIPLINARY POWERS [REPEALED]

Secs. 2.01 to 2.15. Repealed by Acts 1981, 67th Leg., 1st C.S., p. 36, ch. 1, § 6(a), eff. Aug. 5, 1981.

## SUBCHAPTER C. DISTRICT REVIEW COMMITTEES [REPEALED]

Secs. 3.01 to 3.09. Repealed by Acts 1981, 67th Leg., 1st C.S., p. 36, ch. 1, § 6(a), eff. Aug. 5, 1981.

## SUBCHAPTER D. NOTICE

### Notice

Sec. 4.01. (a) Any person or his authorized agent asserting a health care liability claim shall give written notice of such claim by certified mail, return receipt requested, to each physician or health care provider against whom such claim is being made at least 60 days before the filing of a suit in any court of this state based upon a health care liability claim.

(b) In such pleadings as are subsequently filed in any court, each party shall state that it has fully complied with the provisions of this section and shall provide such evidence thereof as the judge of the court may require to determine if the provisions of this Act have been met.

(c) Notice given as provided in this Act shall toll the applicable statute of limitations to and including a period of 75 days following the giving of the notice, and this tolling shall apply to all parties and potential parties.

(d) All parties shall be entitled to obtain complete and unaltered copies of the claimant's medical records from any other party within 10 days from the date of receipt of a written request for such records; provided, however, that the receipt of a medical authorization executed by the claimant herein shall be considered compliance by the claimant with this section.

(e) For the purposes of this section, and notwithstanding Section 5.08, Medical Practices Act (Article 4495b, Vernon's Texas Civil Statutes), or any other law, a request for the medical records of a deceased person or a person who is incompetent shall be deemed to be valid if accompanied by an authorization signed by a parent, spouse, or adult child of the deceased or incompetent person.

## SUBCHAPTER E. AD DAMNUM CLAUSE

### Pleadings not to State Damage Amount; Special Exception; Exclusion from Section

Sec. 5.01. Pleadings in a suit based on a health care liability claim shall not specify an amount of money claimed as damages. The defendant may file a special exception to the pleadings on the ground the suit is not within the court's jurisdiction, in which event, the plaintiff shall inform the court and defendant in writing of the total dollar amount claimed. This section does not prevent a party from mentioning the total dollar amount claimed in examining prospective jurors on voir dire or in argument to the court or jury.

## SUBCHAPTER F. INFORMED CONSENT

### Definition

Sec. 6.01. In this subchapter, "panel" means the Texas Medical Disclosure Panel.

HEALTH—PUBLIC
Title 71

Art. 4590i

### Theory of Recovery

Sec. 6.02.   In a suit against a physician or health care provider involving a health care liability claim that is based on the failure of the physician or health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.

### Texas Medical Disclosure Panel

Sec. 6.03.   (a) The Texas Medical Disclosure Panel is created to determine which risks and hazards related to medical care and surgical procedures must be disclosed by health care providers or physicians to their patients or persons authorized to consent for their patients and to establish the general form and substance of such disclosure.

(b) The panel established herein is administratively attached to the Texas Department of Health.   The Texas Department of Health, at the request of the panel, shall provide administrative assistance to the panel; and the Texas Department of Health and the panel shall coordinate administrative responsibilities in order to avoid unnecessary duplication of facilities and services.   The Texas Department of Health, at the request of the panel, shall submit the panel's budget request to the legislature.   The panel shall be subject, except where inconsistent, to the rules and procedures of the Texas Department of Health; however, the duties and responsibilities of the panel as set forth in the Medical Liability and Insurance Improvement Act of Texas, as amended (Article 4590i, Vernon's Texas Civil Statutes), shall be exercised solely by the panel and the board or Texas Department of Health shall have no authority or responsibility with respect to same.

(c) The panel is composed of nine members, with three members licensed to practice law in this state and six members licensed to practice medicine in this state.   Members of the panel shall be selected by the Commissioner of Health.

(d) The commissioner shall select members of the panel according to the following schedule:

(1) one attorney and two physicians to serve a term of two years, which term shall begin on September 1, 1979, and expire on August 31, 1981, or until a successor is qualified;

(2) one attorney and two physicians to serve a term of four years, which terms shall begin September 1, 1979, and expire August 31, 1983, or until a successor is qualified;

(3) one attorney and two physicians to serve a term of six years, which term shall begin September 1, 1979, and expire on August 31, 1985, or until a successor is qualified.

Thereafter, at the expiration of the term of each member of the panel so appointed, the commissioner shall select a successor, and such successor shall serve for a term of six years, or until his successor is selected.   Any member who is absent for three consecutive meetings without the consent of a majority of the panel present at each such meeting may be removed by the commissioner at the request of the panel submitted in writing and signed by the chairman.   Upon the death, resignation, or removal of any member, the commissioner shall fill the vacancy by selection for the unexpired portion of the term.

(e) Members of the panel are not entitled to compensation for their services, but each panelist is entitled to reimbursement of any necessary expense incurred in the performance of his duties on the panel including necessary travel expenses.

(f) Meetings of the panel shall be held at the call of the chairman or on petition of at least three members of the panel.

(g) At the first meeting of the panel each year after its members assume their positions, the panelists shall select one of the panel members to serve as chairman and one of the panel members to serve as vice-chairman, and each such officer shall serve for a term of one year.   The chairman shall preside at meetings of the panel, and in his absence, the vice-chairman shall preside.

(h) Employees of the Texas Department of Health shall serve as the staff for the panel.

### Duties of Panel

Sec. 6.04.   (a) To the extent feasible, the panel shall identify and make a thorough examination of all medical treatments and surgical procedures in which physicians and health

575

**Art. 4590i**                                                    HEALTH—PUBLIC
                                                                      Title 71

care providers may be involved in order to determine which of those treatments and procedures do and do not require disclosure of the risks and hazards to the patient or person authorized to consent for the patient.

(b) The panel shall prepare separate lists of those medical treatments and surgical procedures that do and do not require disclosure and for those treatments and procedures that do require disclosure shall establish the degree of disclosure required and the form in which the disclosure will be made.

(c) Lists prepared under Subsection (b) of this section together with written explanations of the degree and form of disclosure shall be published in the Texas Register.

(d) At least annually, or at such other period the panel may determine from time to time, the panel will identify and examine any new medical treatments and surgical procedures that have been developed since its last determinations, shall assign them to the proper list, and shall establish the degree of disclosure required and the form in which the disclosure will be made. The panel will also examine such treatments and procedures for the purpose of revising lists previously published. These determinations shall be published in the Texas Register.

#### Duty of Physician or Health Care Provider

Sec. 6.05. Before a patient or a person authorized to consent for a patient gives consent to any medical care or surgical procedure that appears on the panel's list requiring disclosure, the physician or health care provider shall disclose to the patient, or person authorized to consent for the patient, the risks and hazards involved in that kind of care or procedure. A physician or health care provider shall be considered to have complied with the requirements of this section if disclosure is made as provided in Section 6.06 of this subchapter.

#### Manner of Disclosure

Sec. 6.06. Consent to medical care that appears on the panel's list requiring disclosure shall be considered effective under this subchapter if it is given in writing, signed by the patient or a person authorized to give the consent and by a competent witness, and if the written consent specifically states the risks and hazards that are involved in the medical care or surgical procedure in the form and to the degree required by the panel under Section 6.04 of this subchapter.

#### Effect of Disclosure

Sec. 6.07. (a) In a suit against a physician or health care provider involving a health care liability claim that is based on the negligent failure of the physician or health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider:

(1) both disclosure made as provided in Section 6.05 of this subchapter and failure to disclose based on inclusion of any medical care or surgical procedure on the panel's list for which disclosure is not required shall be admissible in evidence and shall create a rebuttable presumption that the requirements of Sections 6.05 and 6.06 of this subchapter have been complied with and this presumption shall be included in the charge to the jury; and

(2) failure to disclose the risks and hazards involved in any medical care or surgical procedure required to be disclosed under Sections 6.05 and 6.06 of this subchapter shall be admissible in evidence and shall create a rebuttable presumption of a negligent failure to conform to the duty of disclosure set forth in Sections 6.05 and 6.06 of this subchapter, and this presumption shall be included in the charge to the jury; but failure to disclose may be found not to be negligent if there was an emergency or if for some other reason it was not medically feasible to make a disclosure of the kind that would otherwise have been negligence.

(b) If medical care or surgical procedure is rendered with respect to which the panel has made no determination either way regarding a duty of disclosure, the physician or health care provider is under the duty otherwise imposed by law.

#### Informed Consent for Hysterectomies

Sec. 6.08. (a) The panel shall develop and prepare written materials to inform a patient or person authorized to consent for a patient of the risks and hazards of a hysterectomy.

576

(b) The materials shall be available in English, Spanish, and any other language the panel considers appropriate. The information must be presented in a manner understandable to a layperson.

(c) The materials must include:

(1) a notice that a decision made at any time to refuse to undergo a hysterectomy will not result in the withdrawal or withholding of any benefits provided by programs or projects receiving federal funds or otherwise affect the patient's right to future care or treatment;

(2) the name of the person providing and explaining the materials;

(3) a statement that the patient or person authorized to consent for the patient understands that the hysterectomy is permanent and nonreversible and that the patient will not be able to become pregnant or bear children if she undergoes a hysterectomy;

(4) a statement that the patient has the right to seek a consultation from a second physician;

(5) a statement that the patient or person authorized to consent for the patient has been informed that a hysterectomy is a removal of the uterus through an incision in the lower abdomen or vagina and that additional surgery may be necessary to remove or repair other organs, including an ovary, tube, appendix, bladder, rectum, or vagina;

(6) a description of the risks and hazards involved in the performance of the procedure; and

(7) a written statement to be signed by the patient or person authorized to consent for the patient indicating that the materials have been provided and explained to the patient or person authorized to consent for the patient and that the patient or person authorized to consent for the patient understands the nature and consequences of a hysterectomy.

(d) The physician or health care provider shall obtain informed consent under this section and Section 6.05 of this Act from the patient or person authorized to consent for the patient before performing a hysterectomy unless the hysterectomy is performed in a life-threatening situation in which the physician determines obtaining informed consent is not reasonably possible. If obtaining informed consent is not reasonably possible, the physician or health care provider shall include in the patient's medical records a written statement signed by the physician certifying the nature of the emergency.

(e) The panel may not prescribe materials under this section without first consulting with the Texas State Board of Medical Examiners.

## SUBCHAPTER G.  RES IPSA LOQUITUR

### Application of Res Ipsa Loquitur

Sec. 7.01.  The common-law doctrine of res ipsa loquitur shall only apply to health care liability claims against health care providers or physicians in those cases to which it has been applied by the appellate courts of this state as of the effective date of this subchapter.

### Jury Instruction Authorized in Certain Cases

Sec. 7.02.  (a) In a jury trial involving a health care liability claim against a physician or hospital for injury to or death of a patient in which the court determines that the following instruction is reasonably applicable to the facts, the court shall provide the following instruction in the court's charge to the jury:

"A finding of negligence may not be based solely on evidence of a bad result to the patient in question, but such a bad result may be considered by you, along with other evidence, in determining the issue of negligence; you shall be the sole judges of the weight, if any, to be given to any such evidence."

(b) Nothing in Subsection (a) of this section shall affect the existing law regarding the applicability or nonapplicability of the doctrine of res ipsa loquitur to a health care liability claim.

(c) The determination of whether the instruction authorized by Subsection (a) of this section is reasonably applicable to the facts shall be made by the trial court in its sole discretion, and such determination by the trial court shall be reviewable by an appellate court only for an abuse of such discretion.

577

**Art. 4590i**                                                      HEALTH—PUBLIC
Title 71

## SUBCHAPTER H. [BLANK]
## SUBCHAPTER I. ADVANCE PAYMENTS

Secs. 9.01, 9.02.  Repealed by Texas Rules of Evidence, eff. Sept. 1, 1983 (Acts 1939, 46th Leg., p. 201, § 1); Texas Rules of Criminal Evidence, eff. Sept. 1, 1986 [Acts 1985, 69th Leg., ch. 685, § 9(b)].

### Adjustments for Advance Payments

Sec. 9.03.  The advance payment shall inure to the exclusive benefit of the defendant or his or its carrier making the advance payment, and in the event the advance payment exceeds the pro rata liability of the defendant or the carrier making the payment, the trial judge shall order any adjustment necessary to equalize the amount which each defendant is obligated to pay under this subchapter, exclusive of costs.

### Certain Advance Payments Exempt from Repayment

Sec. 9.04.  In no case shall an advance payment in excess of an award be repayable by the person receiving it.

## SUBCHAPTER J.  STATUTE OF LIMITATIONS

### Limitation on Health Care Liability Claims

Sec. 10.01.  Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed; provided that, minors under the age of 12 years shall have until their 14th birthday in which to file, or have filed on their behalf, the claim.  Except as herein provided, this subchapter applies to all persons regardless of minority or other legal disability.

### Causes of Action Covered by Other Law

Sec. 10.02.  Causes of action accruing between the effective date of this Act and the effective date of Article 5.82, Insurance Code, shall be filed pursuant to Section 4 of Article 5.82.

## SUBCHAPTER K.  LIABILITY LIMITS

### Definition

Sec. 11.01.  In this subchapter, "consumer price index" means the index published by the Bureau of Labor Statistics of the United States Department of Labor that measures the average change in prices of goods and services purchased by urban wage earners and clerical workers' families and single workers living alone.

### Limit on Civil Liability

Sec. 11.02.  (a) In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.

(b) Subsection (a) of this section does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

(c) This section shall not limit the liability of any insurer where facts exist that would enable a party to invoke the common law theory of recovery commonly known in Texas as the "Stowers Doctrine."

(d) In any action on a health care liability claim that is tried by a jury in any court in this state, the following shall be included in the court's written instructions to the jurors: Do not consider, discuss, nor speculate whether or not liability, if any, on the part of any party is or is not subject to any limit under applicable law.

### Alternative Partial Limit on Civil Liability

Sec. 11.03. In the event that Section 11.02(a) of this subchapter is stricken from this subchapter or is otherwise invalidated by a method other than through legislative means, the following shall become effective:

In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability of the physician or health care provider for all past and future noneconomic losses recoverable by or on behalf of any injured person and/or the estate of such person, including without limitation as applicable past and future physical pain and suffering, mental anguish and suffering, consortium, disfigurement, and any other nonpecuniary damage, shall be limited to an amount not to exceed $150,000.

### Adjustment of Liability Limits

Sec. 11.04. When there is an increase or decrease in the consumer price index with respect to the amount of that index on the effective date of this subchapter each of the liability limits prescribed in Section 11.02(a) or in Section 11.03 of this subchapter, as applicable, shall be increased or decreased, as applicable, by a sum equal to the amount of such limit multiplied by the percentage increase or decrease in the consumer price index between the effective date of this subchapter and the time at which damages subject to such limits are awarded by final judgment or settlement.

### Subchapter's Application Prevails over Certain Other Laws

Sec. 11.05. The provisions of this subchapter shall apply notwithstanding the provisions contained in Article 4671, Revised Civil Statutes of Texas, 1925, as amended, and the provisions of Article 5525, Revised Civil Statutes of Texas, 1925, as amended.

## SUBCHAPTER L.  MISCELLANEOUS PROVISIONS

### Exception From Certain Laws

Sec. 12.01. (a) Notwithstanding any other law, no provisions of Sections 17.41–17.63, Business & Commerce Code, shall apply to physicians or health care providers as defined in Section 1.03(3) of this Act, with respect to claims for damages for personal injury or death resulting, or alleged to have resulted, from negligence on the part of any physician or health care provider.

(b) This section shall not apply to pharmacists.

## SUBCHAPTER M.  PROCEDURAL PROVISIONS

### Cost Bond, Deposit, and Expert Report

Sec. 13.01. (a) In a health care liability claim, a claimant shall, not later than the 90th day after the date the claim is filed:

(1) file a separate cost bond in the amount of $5,000 for each physician or health care provider named by the claimant in the action;

(2) place cash in an escrow account in the amount of $5,000 for each physician or health care provider named in the action; or

(3) file an expert report for each physician or health care provider with respect to whom a cost bond has not been filed and cash in lieu of the bond has not been deposited under Subdivision (1) or (2) of this subsection.

(b) If, as to a defendant physician or health care provider, an expert report, cost bond, or cash in lieu of bond has not been filed or deposited within the period specified by Subsection (a) or (h) of this section, the court, on the motion of the affected physician or health care provider, shall enter an order that:

(1) requires the filing of a $7,500 cost bond with respect to the physician or health care provider not later than the 21st day after the date of the order; and

(2) provides that if the claimant fails to comply with the order, the action shall be dismissed for want of prosecution with respect to the physician or health care provider, subject to reinstatement in accordance with the applicable rules of civil procedure and Subsection (c) of this section.

579

(c) Before a claim that has been dismissed under Subsection (b)(2) of this section may be reinstated, the claimant must pay the costs of court incurred by the defendant before the dismissal and file a $7,500 cost bond for each defendant physician or health care provider.

(d) Not later than the later of the 180th day after the date on which a health care liability claim is filed or the last day of any extended period established under Subsection (f) or (h) of this section, the claimant shall, for each physician or health care provider against whom a claim is asserted:

(1) furnish to counsel for each physician or health care provider one or more expert reports, with a curriculum vitae of each expert listed in the report; or

(2) voluntarily nonsuit the action against the physician or health care provider.

(e) If a claimant has failed, for any defendant physician or health care provider, to comply with Subsection (d) of this section within the time required, the court shall, on the motion of the affected physician or health care provider, enter an order awarding as sanctions against the claimant or the claimant's attorney:

(1) the reasonable attorney's fees and costs of court incurred by that defendant;

(2) the forfeiture of any cost bond respecting the claimant's claim against that defendant to the extent necessary to pay the award; and

(3) the dismissal of the action of the claimant against that defendant with prejudice to the claim's refiling.

(f) The court may, for good cause shown after motion and hearing, extend any time period specified in Subsection (d) of this section for an additional 30 days. Only one extension may be granted under this subsection.

(g) Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline established by Subsection (d) of this section and after hearing the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

(h) The affected parties may agree to extend any time period specified in Subsection (a) or (d) of this section. An agreement under this subsection is binding and shall be honored by the court if signed by the affected parties or their counsel and filed with the court.

(i) Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for filing an expert report by filing reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

(j) Nothing in this section shall be construed to require the filing of an expert report regarding any issue other than an issue relating to liability or causation.

(k) Notwithstanding any other law, an expert report filed under this section:

(1) is not admissible in evidence by a defendant;

(2) shall not be used in a deposition, trial, or other proceeding; and

(3) shall not be referred to by a defendant during the course of the action for any purpose.

(l) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of this section.

(m) On the claimant's compliance with the requirements of Subsection (d) of this section:

(1) any cost bond filed or cash deposited in an escrow account by the claimant under this section shall be released;

(2) the claimant, the claimant's counsel, and any surety have no liability on the cost bond or cash deposit; and

(3) an execution shall not be issued on the cost bond or cash deposit.

HEALTH—PUBLIC
·Title 71

Art. 4590i

(n) If a claimant nonsuits a health care liability claim against a physician or health care provider before filing a cost bond and seeks to refile the same or á similar health care liability claim against the physician or health care provider, the claimant shall file a $7,500 cost bond for each previously nonsuited physician or health care provider at the time of the filing of the health care liability claim. If the claimant fails to file the $7,500 cost bond for each physician or health care provider, on motion and hearing the court shall order the filing of the cost bond and the claimant shall pay the movant reasonable attorney's fees incurred in obtaining relief under this subsection.

(o) Notwithstanding any other provision of this section, a claimant who is proceeding without an attorney and who is unable to afford a cost bond or cash deposit may, in lieu of a cost bond or cash deposit, file an affidavit in the same form required for an affidavit in lieu of security for costs under the Texas Rules of Civil Procedure.

(p) In the event of a conflict between this section and another law, including a rule of procedure or court rule, this section controls to the extent of the conflict.

(q) Notwithstanding the provisions of Section 22.004, Government Code, the supreme court may not amend or adopt rules in conflict with this section. The district courts and statutory county courts in a county may not adopt local rules in conflict with this section.

(r) In this section:

(1) "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement·required or permitted by this section and does not include other parties to an action who.are not directly affected by.that particular.act or agreement.

(2) "Claim" means a health care liability claim.

(3) "Claimant" means a party who files a pleading asserting a claim.··All plaintiffs claiming to have·sustained damages as the result of the bodily injury or death of a single person are considered to be a single claimant.·

(4) "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

(5) "Expert" means:

(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 14.01(a) of this Act; or

(B) with respect to a person giving opinion testimony about a nonphysician health care provider, an expert who has knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Discovery Procedures

Sec.·13.02.  (a) In every health care liability·claim the plaintiff shall within 45 days after the date of filing of the original petition serve on the defendant's·attorney or, if no attorney has appeared for the defendant, on the defendant full and complete answers to the appropriate standard set of interrogatories and full and complete responses to the appropri-ate standard set of requests for production of documents and things promulgated in accordance with Subsection (c) of this section.

(b) Every physician or health care provider who is a defendant in a health care liability claim shall within 45 days after the date on which an answer to the petition was due serve on the plaintiff's attorney or, if the plaintiff is not represented by an attorney, on the plaintiff full and complete answers to the appropriate standard set of interrogatories and complete responses to the standard set of requests for production of documents and things promulgat-ed pursuant to Subsection (c) of this section.

581

(c) The chief justice of the Supreme Court of Texas shall within 30 days after the effective date of this Act appoint as members of the Health Care Liability Discovery Panel three persons from a list of attorneys to be submitted by a statewide association of attorneys whose members include persons who customarily represent patients in health care liability actions and three persons from a list of attorneys to be submitted by a statewide association of attorneys whose members include persons who customarily represent defendants in health care liability actions. Members of the Health Care Liability Discovery Panel serve without compensation. On or before the 1st day of November, 1993, the Health Care Liability Discovery Panel shall promulgate standard sets of interrogatories and requests for production of documents and things appropriate for each of the categories of plaintiffs and defendants usually involved in health care liability claims. In preparing standard sets of interrogatories the Health Care Liability Discovery Panel shall not be restricted in number by any limit imposed under the Texas Rules of Civil Procedure.

(d) The Supreme Court of Texas shall review the standard sets of interrogatories and requests for production of documents and things promulgated by the Health Care Liability Discovery Panel and shall, no later than January 1, 1994, approve them in their entirety, disapprove them in their entirety, or approve them with modifications. If the supreme court disapproves such standard sets of interrogatories and requests for production of documents and things in their entirety, then such standard sets shall be null and void and of no effect, and the Health Care Liability Discovery Panel shall be disbanded. If the supreme court approves such standard sets of interrogatories and requests for production of documents and things with modifications, then the Health Care Liability Discovery Panel shall either approve or disapprove of such standard sets of interrogatories and requests for production of documents and things as modified by the supreme court by a vote of at least five of the six members of the panel. If the modifications made by the supreme court fail to obtain the necessary vote for approval by the panel, then such standard sets of interrogatories and requests for production of documents and things shall be null and void and of no effect and the panel shall be disbanded. If the panel approves the modified standard sets of interrogatories and requests for production of documents and things, then the supreme court shall proceed to publish the standard sets in accordance with Subsection (e) of this section.

(e) As soon as practical after the approval of such standard sets of interrogatories and requests for production of documents and things by the Health Care Liability Discovery Panel and the Supreme Court of Texas, and in any event no later than February 1, 1994, the supreme court shall publish such standard sets. Notwithstanding any other law, the supreme court shall not be required to publish such standard sets of interrogatories and requests for production of documents and things for public comment. Beginning on April 1, 1994, all plaintiffs and all physicians or health care providers who are defendants in a health care liability claim in which the plaintiff's original petition is filed on or after that date shall file full and complete answers and responses in accordance with Subsections (a) and (b) of this section.

(f) Nothing in this section shall limit or impede the Supreme Court of Texas in exercising its rulemaking authority pursuant to Sections 22.003 and 22.004, Government Code.

(g) Except on motion and for good cause shown, no objection may be asserted regarding any standard interrogatory or request for production of documents and things, but no response shall be required where a particular interrogatory or request is clearly inapplicable under the circumstances of the case.

(h) Failure to file full and complete answers and responses to standard interrogatories and requests for production of documents and things in accordance with Subsections (a) and (b) of this section or the making of a groundless objection under Subsection (g) of this section shall be grounds for sanctions by the court in accordance with the Texas Rules of Civil Procedure on motion of any party.

(i) The time limits imposed under Subsections (a) and (b) of this section may be extended by the court on the motion of a responding party for good cause shown and shall be extended if agreed in writing between the responding party and all opposing parties. In no event shall an extension be for a period of more than an additional 30 days.

(j) If a party is added by an amended pleading, intervention, or otherwise, the new party shall file full and complete answers to the appropriate standard set of interrogatories and full and complete responses to the standard set of requests for production of documents and

582

Art. 4590i

things no later than 45 days after the date of filing of the pleading by which the party first appeared in the action.

(k) If information or documents required to provide full and complete answers and responses as required by this section are not in the possession of the responding party or attorney when the answers or responses are filed, the party shall supplement the answers and responses in accordance with the Texas Rules of Civil Procedure.

(l) Nothing in this section shall preclude any party from taking additional non-duplicative discovery of any other party. The standard sets of interrogatories provided for in this section shall not constitute, as to each plaintiff and each physician or health care provider who is a defendant, the first of the two sets of interrogatories permitted under the Texas Rules of Civil Procedure.

(m) Notwithstanding any other provisions of this section, if a court of this state has, prior to the effective date of this section, signed an order in tort litigation in which cases have been consolidated for discovery providing for standard sets of interrogatories and requests for production of documents and things, compliance with such an order shall be deemed to be compliance with the requirements of this section.

## SUBCHAPTER N. EXPERT WITNESSES

### Qualification of Expert Witness in Suit Against Physician

Sec. 14.01. (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

(b) For the purpose of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

(d) The court shall apply the criteria specified in Subsections (a), (b), and (c) of this section in determining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care, but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

(e) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This

**Art. 4590i**

subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

(f) This section does not prevent a physician who is a defendant from qualifying as an expert.

## SUBCHAPTER O. ARBITRATION AGREEMENTS

### Arbitration Agreements

Sec. 15.01. (a) No physician, professional association of physicians, or other health care provider shall request or require a patient or prospective patient to execute an agreement to arbitrate a health care liability claim unless the form of agreement delivered to the patient contains a written notice in 10-point boldface type clearly and conspicuously stating:

UNDER TEXAS LAW, THIS AGREEMENT IS INVALID AND OF NO LEGAL EFFECT UNLESS IT IS ALSO SIGNED BY AN ATTORNEY OF YOUR OWN CHOOSING. THIS AGREEMENT CONTAINS A WAIVER OF IMPORTANT LEGAL RIGHTS, INCLUDING YOUR RIGHT TO A JURY. YOU SHOULD NOT SIGN THIS AGREEMENT WITHOUT FIRST CONSULTING WITH AN ATTORNEY.

(b) A violation of this section by a physician or professional association of physicians constitutes a violation of the Medical Practice Act (Article 4495b, Vernon's Texas Civil Statutes), and shall be subject to the enforcement provisions and sanctions contained in Subchapter D of that Act.

(c) A violation of this section by a health care provider other than a physician shall constitute a false, misleading, or deceptive act or practice in the conduct of trade or commerce within the meaning of Section 17.46 of the Deceptive Trade Practices-Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code), and shall be subject to an enforcement action by the consumer protection division pursuant to said Act and subject to the penalties and remedies contained in Section 17.47 of that Act, notwithstanding Section 12.01 of this Act or any other law.

(d) Notwithstanding any other provision of this section, a person who is found to be in violation of this section for the first time shall be subject only to injunctive relief or other appropriate order requiring the person to cease and desist from such violation, and not to any other penalty or sanction.

## SUBCHAPTER P. PREJUDGMENT INTEREST

### Application of Other Law

Sec. 16.01. Notwithstanding Articles 1E.101, 1E.102, and 1E.104–1E.108, Title 79, Revised Statutes, prejudgment interest in a health care liability claim shall be awarded in accordance with this subchapter.

### Computation of Prejudgment Interest

Sec. 16.02. (a) In a health care liability claim, prejudgment interest may not be charged with respect to a defendant physician or health care provider who has settled the claim before the 181st day after the date notice of the claim was first mailed to the physician or health care provider.

(b) In a health care liability claim that is not settled within the period specified by Subsection (a) of this section, the judgment must include prejudgment interest on past damages found by the trier of fact, but shall not include prejudgment interest on future damages found by the trier of fact.

(c) Prejudgment interest allowed under this subchapter shall be computed in accordance with Article 1E.103, Title 79, Revised Statutes, for a period beginning on the date of injury and ending on the date before the date the judgment is signed.

(d) In this section:

(1) "Past damages" means damages awarded to compensate the claimant for loss the claimant will incur for a period beginning on the date of injury and ending on the date before the date of judgment.

584

HEALTH—PUBLIC
Title 71

Art. 4590i

s at trial

(2) "Future damages" means damages awarded to compensate the claimant for loss the claimant will incur after the date of judgment.

ng as an

Acts 1977, 65th Leg., p. 2039, ch. 817, Part 1, eff. Aug. 29, 1977. Sec. 6.03 amended by Acts 1979, 66th Leg., p. 1259, ch. 596, § 1, eff. Aug. 27, 1979; Sec. 6.04 amended by Acts 1979, 66th Leg., p. 1260, ch. 596, § 2, eff. Aug. 27, 1979; Sec. 7.02 amended by Acts 1989, 71st Leg., ch. 1027, § 28, eff. Sept. 1, 1989; Sec. 14.01 added by Acts 1989, 71st Leg., ch. 1027, § 27, eff. Sept. 1, 1989; Sec. 1.03(a)(5) amended by Acts 1991, 72nd Leg., ch. 14, § 284(15), eff. Sept. 1, 1991; Sec. 4.01(e) added by Acts 1993, 73rd Leg., ch. 625, § 5, eff. Sept. 1, 1993; Secs. 13.01, 13.02 added by Acts 1993, 73rd Leg., ch. 625, § 3, eff. Sept. 1, 1993; Sec. 15.01 added by Acts 1993, 73rd Leg., ch. 625, § 4, eff. Sept. 1, 1993; Sec. 13.01 amended by Acts 1995, 74th Leg., ch. 140, § 1, eff. Sept. 1, 1995; Sec. 14.01 amended by Acts 1995, 74th Leg., ch. 140, § 2, eff. Sept. 1, 1995; Secs. 16.01, 16.02 added by Acts 1995, 74th Leg., ch. 140, § 3, eff. Sept. 1, 1995; Sec. 6.08 added by Acts 1997, 75th Leg., ch. 1228, § 1, eff. Sept. 1, 1997; Sec. 16.01 amended by Acts 1997, 75th Leg., ch. 1396, § 44, eff. Sept. 1, 1997; Sec. 16.02(c) amended by Acts 1997, 75th Leg., ch. 1396, § 45, eff. Sept. 1, 1997.

alth care
ement to
e patient

[1] See note under V.A.T.S. Insurance Code, art. 21.49–3.

LEGAL
R OWN
NT LE-
OT SIGN
ORNEY.

hysicians
xas Civil
tained in

### Historical and Statutory Notes

Sections 41.01 to 41.04 of the 1977 Act provide:

"Sec. 41.01. The provisions of this Act shall apply only to causes of action based on health care liability claims accruing after the effective date of this Act.

"Sec. 41.02. This Act expires at midnight on August 31, 1993.

"Sec. 41.03. Article 5.82, Insurance Code, and Section 3, Chapter 331, Acts of the 64th Legislature, Regular Session, 1975, are repealed.

"Sec. 41.04. If any provision of this statute or its application to any person or circumstance is held invalid or unconstitutional, such invalidity does not affect other provisions or applications of this statute which can be given effect without the invalid clause, sentence, subsection, section, article, or provision or application, and shall not affect, impair, invalidate, or nullify the remainder of this Act, but the effect thereof shall be confined to the clause, sentence, subsection, section, article, or provision of the Act so adjudged to be invalid or unconstitutional and to this end the above are declared to be severable."

A subchapter H of this article as enacted by Acts 1977, 65th Leg., ch. 817, Part 1, consisting of §§ 8.01 to 8.05, relating to bad faith, cause of action, failed to take effect by virtue of its own terms. Section 8.05 provided, in part, that "[t]his subchapter will take effect if and only if the State Bar of Texas fails to certify to the Supreme Court of Texas by January 31, 1979, that it has adopted rules for appropriate disciplinary measures against an attorney who has been determined to have filed a claim in bad faith." The State Bar of Texas certified to the Supreme Court of Texas on May 10, 1978, that it had adopted "rules for appropriate disciplinary measures against an attorney who has been determined to have filed a claim in bad faith, specifically DR 7–102(A)(1) and (2)".

Subsections (a), (f), and (h) of § 3 of the 1981 amendatory act provide:

"(a) The Texas State Board of Medical Examiners previously established under the laws of this state is continued as an independent administrative agency of the executive branch of government."

"(f) Proceedings to deny an application for license or other authorization to practice medicine, cancel, revoke, suspend, or limit a license, or otherwise discipline a licensee do not abate by reason of the passage of this Act."

"(h) The district review committees created and established pursuant to Subchapter C of the Medical Liability and Insurance Improvement Act of Texas are hereby continued and recreated under the jurisdiction of the board. The number of and geographic area composed of various counties designated by the board on the effective date of this Act are hereby validated. A person holding office as a member of a district review committee on the effective date of this Act continues to hold office for the term for which the person was originally appointed or until a successor shall be appointed and qualified. Thereafter, at the expiration of the term of each member appointed, a successor shall be appointed. The terms of office of all succeeding members expire January 15 of even-numbered years."

Section 2 of Acts 1991, 72nd Leg., ch. 608 provides:

"Part 4, Section 41.02, Chapter 817, Acts of the 65th Legislature, 1977, is hereby repealed only insofar as it relates to the trust under Article 21.49–4, Insurance Code, but Section 41.02 is not otherwise repealed and shall be continued in full force and effect for all other purposes."

By order of the Texas Supreme Court dated November 23, 1982, effective September 1, 1983, adopting the Texas Rules of Evidence, §§ 9.01, 9.02 of this article were deemed to be repealed insofar as they related to civil actions by the Rules of Practice Act, Acts 1939, 46th Leg., p. 201, § 1, classified as art. 1731a, § 1 (repealed; see, now, V.T.C.A. Government Code, § 22.004).

See, now, Vernon's Ann.Rules Civ.Evidence, rules 408, 409, 411.

By order of the Court of Criminal Appeals dated December 18, 1985, effective September 1, 1986 adopting the Texas Rules of Criminal Evidence, §§ 9.01, 9.02 of this article are deemed to be repealed as they relate to criminal cases and criminal law matters pursuant to Acts 1985, 69th Leg.,

79, Re-
arded in

e charged
im before
ealth care

ecified by
on past
on future

cordance
of injury

loss the
te before

# Exhibit 2

**FLORES, CASSO & PETTITT, L. L. P.**

ATTORNEYS AT LAW

321 SOUTH 12TH STREET

POST OFFICE BOX 2128

McALLEN, TEXAS 78505-2128

ATTORNEYS
RAFAEL H. FLORES
DAVID CASSO
B. BUCK PETTITT

LITIGATION ADMINISTRATORS
EDMUNDO MARTINEZ
ROBERTO R. RAMOS
MARIO GARZA

TELEPHONE
(956) 686-9591

FAX
(956) 686-9478

March 21, 2002

<u>**VIA CERTIFIED MAIL/RRR**</u>
<u>**NO. 7099 3220 0000 4586 6407**</u>

Dr. Rajiv Finga
Raymondville Family Medical Clinic
637 E. Hidalgo
Raymondville, Texas 78580

   Re: Juanita Blanco
     S.S.N.:  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
     D.O.B.: September 29, 1928

Dear Dr. Finga:

   This firm has been retained to represent our referenced client, in connection with the legal claims our referenced client has arising out of medical care and/or treatment provided by the person to whom this letter is addressed, including, without limitation, all claims constituting "health care liability claims" within the meaning of TEX. REV. CIV. STAT. ANN. Art 4590i, § 1.03(a)(4).

   Our referenced client has sustained legal damages, including, without limitation, physical impairment, physical incapacity, mental anguish and medical care expenses, as proximate results of misrepresentations and/or negligence on the part of the person to whom this letter is addressed, which relate to the treatment of our referenced client with the drug Rezulin.  While we believe that the drug's manufacturer bears a heavy responsibility in this case, suit will be brought against all responsible parties.

   This letter constitutes notice to the person to whom it is addressed, pursuant to TEX. REV. CIV. STAT. ANN. Art. 4590i § 4.01(a), of our referenced client's intention to bring suit against such person to recover all legal damages, however denominated, including, without limitation, all compensatory damages, statutory penalty damages, and exemplary damages, to which our referenced client may be entitled, at law or in equity.

Dr. Rajiv Finga
March 21, 2002
Page Two

Sincerely,

**FLORES, CASSO & PETTITT, L.L.P.**

By: _____

David Casso

DC:lll

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Received by *(Please Print Clearly)* *Tencha Quintanilla*   B. Date of Delivery *3/22/02*<br>C. Signature<br>X *Tencha Quintanilla* ☐ Agent ☐ Addressee<br>D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No |

1. Article Addressed to:

Dr. Rajiv Finga
637 E. Hidalgo
Raymondville, TX   78580

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number *(Copy from service label)*
7099 3220 0000 4586 6407

PS Form 3811, July 1999     Domestic Return Receipt     102595-00-M-0952



U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

Article Sent To:

Postage $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $

Postmark
Here
*Juanita*
*Blanco*

*(to be completed by mailer)*
Dr. Rajiv Finga @ Raymondville Family Med. Ctr.
637 E. Hidalgo
Raymondville, TX 78580

See Reverse for Instructions
PS Form 3800, July 1999

# Exhibit 3

FLORES, CASSO & PETTITT, L. L. P.
ATTORNEYS AT LAW
321 SOUTH 12TH STREET
POST OFFICE BOX 2128
McALLEN, TEXAS 78505-2128

ATTORNEYS
RAFAEL H. FLORES
DAVID CASSO
B. BUCK PETTITT

LITIGATION ADMINISTRATORS
EDMUNDO MARTINEZ
ROBERTO R. RAMOS
MARIO GARZA

TELEPHONE
(956) 686-9591

FAX
(956) 686-9478

March 21, 2002

**VIA CERTIFIED MAIL/RRR**
**NO. 7099 3220 0000 4586 5455**

Dr. Mark Edwards
Valley Baptist Medical Center
2101 Pease
Brownsville, Texas  78521

   Re:  Ruben Garcia
       S.S.N.: 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
       D.O.B.: December 13, 1947

Dear Dr. Edwards:

   This firm has been retained to represent our referenced client, in connection with the legal claims our referenced client has arising out of medical care and/or treatment provided by the person to whom this letter is addressed, including, without limitation, all claims constituting "health care liability claims" within the meaning of TEX. REV. CIV. STAT. ANN. Art 4590i, § 1.03(a)(4).

   Our referenced client has sustained legal damages, including, without limitation, physical impairment, physical incapacity, mental anguish and medical care expenses, as proximate results of misrepresentations and/or negligence on the part of the person to whom this letter is addressed, which relate to the treatment of our referenced client with the drug Rezulin.  While we believe that the drug's manufacturer bears a heavy responsibility in this case, suit will be brought against all responsible parties.

   This letter constitutes notice to the person to whom it is addressed, pursuant to TEX. REV. CIV. STAT. ANN. Art. 4590i § 4.01(a), of our referenced client's intention to bring suit against such person to recover all legal damages, however denominated, including, without limitation, all compensatory damages, statutory penalty damages, and exemplary damages, to which our referenced client may be entitled, at law or in equity.

Dr. Mark Edwards
March 21, 2002
Page Two

_____

Sincerely,

**FLORES, CASSO & PETTITT, L.L.P.**

By: _____
    David Casso

DC:lll

FLORES, CASSO & PETTITT, L. L. P.



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only: No Insurance Coverage Provided)*

| | |
|---|---|
| **Article Sent To:** | |
| Postage $ | |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees $ | |

Postmark
Here

*Ruben Garcia*

**Name (Please Print Clearly) (To be completed by mailer)**
Dr. Mark Edwards
Street, Apt. No.; or PO Box No. Valley Reg. Med. Ctr.
2102 Pease
City, State, ZIP+4
Hlin, Tx 78552

7094 3220 0000 4586 5455

PS Form 3800, July 1999          See Reverse for Instructions

# Exhibit 4

FLORES, CASSO & PETTITT, L. L. P.
ATTORNEYS AT LAW
321 SOUTH 12TH STREET
POST OFFICE BOX 2128
McALLEN, TEXAS 78505-2128

ATTORNEYS
RAFAEL H. FLORES
DAVID CASSO
B. BUCK PETTITT

LITIGATION ADMINISTRATORS
EDMUNDO MARTINEZ
ROBERTO R. RAMOS
MARIO GARZA

TELEPHONE
(956) 686-9591

FAX
(956) 686-9478

March 21, 2002

**VIA CERTIFIED MAIL/RRR**
**NO. 7099 3220 0000 4586 7237**

Dr. George Cantu
322 Petra Ave.
Raymondville, Texas 78580

> Re:  Nicolas Rodriguez
> S.S.N.: 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
> D.O.B.: October 18, 1929

Dear Dr. Cantu:

This firm has been retained to represent our referenced client, in connection with the legal claims our referenced client has arising out of medical care and/or treatment provided by the person to whom this letter is addressed, including, without limitation, all claims constituting "health care liability claims" within the meaning of TEX. REV. CIV. STAT. ANN. Art 4590i, § 1.03(a)(4).

Our referenced client has sustained legal damages, including, without limitation, physical impairment, physical incapacity, mental anguish and medical care expenses, as proximate results of misrepresentations and/or negligence on the part of the person to whom this letter is addressed, which relate to the treatment of our referenced client with the drug Rezulin.  While we believe that the drug's manufacturer bears a heavy responsibility in this case, suit will be brought against all responsible parties.

This letter constitutes notice to the person to whom it is addressed, pursuant to TEX. REV. CIV. STAT. ANN. Art. 4590i § 4.01(a), of our referenced client's intention to bring suit against such person to recover all legal damages, however denominated, including, without limitation, all compensatory damages, statutory penalty damages, and exemplary damages, to which our referenced client may be entitled, at law or in equity.

Dr. George Cantu
March 21, 2002
Page Two

_____

                              Sincerely,

                              **FLORES, CASSO & PETTITT, L.L.P.**

                    By:    _____
                              David Casso

DC:lll

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Received by (Please Print Clearly)     B. Date of Delivery   3·22·0 <br><br> C. Signature     ☐ Agent     ☐ Addressee <br> X <br> D. Is delivery address different from item 1? ☐ Yes <br>    If YES, enter delivery address below: ☐ No |

1. Article Addressed to:

**Dr. George Cantu**
**322 Petra Avenue**
**Raymondville, Texas 78580**

**Nicolas Rodriguez:DC:lll**

| 3. Service Type |
|---|
| ☑ Certified Mail    ☐ Express Mail <br> ☐ Registered    ☑ Return Receipt for Merchandise <br> ☐ Insured Mail    ☐ C.O.D. |
| 4. Restricted Delivery? (Extra Fee)     ☐ Yes |

2. Article Number (Copy from service label)

**7099322000045867237**

PS Form 3811, July 1999       Domestic Return Receipt       102595-99-M-1789

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Article Sent To:

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

*Nicolas Rodriguez*

Name (Please Print Clearly) (To be completed by mailer)
Dr. George Centu
Street, Apt. No.; or PO Box No.
322 Petra Ave.
City, State, ZIP+4
Raymondville, Tx 78580

PS Form 3800, July 1999       See Reverse for Instructions

7099 3220 0000 4586 7237

# Exhibit 5

**FLORES, CASSO & PETTITT, L. L. P.**
**ATTORNEYS AT LAW**

ATTORNEYS
RAFAEL H. FLORES
DAVID CASSO
B. BUCK PETTITT

321 SOUTH 12TH STREET
POST OFFICE BOX 2128
McALLEN, TEXAS 78505-2128

TELEPHONE
(956) 686-9591

FAX
(956) 686-9478

LITIGATION ADMINISTRATORS
EDMUNDO MARTINEZ
ROBERTO R. RAMOS
MARIO GARZA

March 21, 2002

**VIA CERTIFIED MAIL/RRR**
**NO. 7099 3220 0000 4586 7244**

Dr. Allan B. Spence
336 S. 8th Street
Raymondville, Texas 78580

     Re:    Maria Inez Ruiz, Deceased
              D.O.B.: April 20, 1925

Dear Dr. Spence:

     This firm has been retained to represent our referenced client, in connection with the legal claims our referenced client has arising out of medical care and/or treatment provided by the person to whom this letter is addressed, including, without limitation, all claims constituting "health care liability claims" within the meaning of TEX. REV. CIV. STAT. ANN. Art 4590i, § 1.03(a)(4).

     Our referenced client has sustained legal damages, including, without limitation, physical impairment, physical incapacity, mental anguish and medical care expenses, as proximate results of misrepresentations and/or negligence on the part of the person to whom this letter is addressed, which relate to the treatment of our referenced client with the drug Rezulin. While we believe that the drug's manufacturer bears a heavy responsibility in this case, suit will be brought against all responsible parties.

     This letter constitutes notice to the person to whom it is addressed, pursuant to TEX. REV. CIV. STAT. ANN. Art. 4590i § 4.01(a), of our referenced client's intention to bring suit against such person to recover all legal damages, however denominated, including, without limitation, all compensatory damages, statutory penalty damages, and exemplary damages, to which our referenced client may be entitled, at law or in equity.

Dr. Allan B. Spence
March 21, 2002
Page Two

_____

Sincerely,

**FLORES, CASSO & PETTITT, L.L.P.**

By: _____

David Casso

DC:lll

FLORES, CASSO & PETTITT, L. L. P.

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dr. Allen B. Spence
336 S. 8th
Raymondville, Texas 78580

**Maria Inez Ruiz: DC:lll**

*COMPLETE THIS SECTION ON DELIVERY*

A. Received by (Please Print Clearly)    B. Date of Delivery
5-22-02

C. Signature
X _Van dre Rebelen_    ☐ Agent
☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☑ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)

7099322000045867244

PS Form 3811, July 1999        Domestic Return Receipt        102595-99-M-1789

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Article Sent To:

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Maria Inez Ruiz, Dec 4    Postmark Here

Name (Please Print Clearly) (To be completed by mailer)
Dr. Allen B. Spence
Street, Apt. No.; or PO Box No.
336 S. 8th
City, State, ZIP+4
Raymondville, Tx 78580

7099 3220 0000 4586 7244

PS Form 3800, July 1999        See Reverse for Instructions

# Exhibit 6

CAUSE NO. <u>03-161</u>

| | | |
|---|---|---|
| JUANITA BLANCO; RUBEN | § | IN THE DISTRICT COURT OF |
| GARCIA; NICOLAS RODRIGUEZ | § | |
| HERMELINDA QUIROGA, | § | |
| INDIVIDUALLY AND ON BEHALF | § | |
| OF THE ESTATE OF MARIA | § | |
| INEZ RUIZ, | § | |
|      PLAINTIFFS | § | |
| | § | |
| | § | |
| v. | § | |
| | § | WILLACY COUNTY, TEXAS |
| PFIZER INC.; and WARNER-LAMBERT | § | |
| COMPANY, now known as PFIZER | § | |
| INC.;RAJIV FINGA, M.D., MARK | § | |
| EDWARDS, M.D., GEORGE CANTU, | § | |
| M.D., ALLEN B. SPENCE, M.D., AND | § | |
| WATSON'S CITY DRUG, | § | |
|      DEFENDANTS | § | 197th JUDICIAL DISTRICT |

<u>PLAINTIFFS' FIRST AMENDED PETITION</u>

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Juanita Blanco; Ruben Garcia; Nicolas Rodriguez; and Hermelinda Quiroga, individually and on behalf of the Estate of Maria Inez Ruiz, Plaintiffs herein, complaining of Pfizer, Inc.; and Warner-Lambert Company, now known as Pfizer, Inc.; Watson's City Drug, Rajiv Finga, M.D., Mark Edwards, M.D., George Cantu, M.D., and Allen B. Spence, M.D., Defendants herein, and for cause of action would respectfully show the Court the following:

I.

<u>Discovery</u>

Plaintiffs allege that discovery herein is being conducted under Level 2 of Rule 190

of the Texas Rules of Civil Procedure.

## II.

## **Parties**

Plaintiffs Juanita Blanco, Ruben Garcia, and Nicolas Rodriguez were residents of Willacy County, Texas, at the times the causes of action that are the basis of this suit accrued.

Hermelinda Qiroga, Individually, became a wrongful death beneficiary upon Ms. Maria Inez Ruiz' death.

Defendant Pfizer, Inc. (Pfizer) is a Delaware corporation transacting and conducting business within the State of Texas and Willacy County.  Service may be made on it by serving its registered agent: C. T. Corporation System, 350 North Saint Paul Street, Dallas, Texas 75201.

Defendant Warner-Lambert Company ( Warner-Lambert) was a New Jersey corporation transacting and conducting business within the State of Texas and Willacy County.  Through a series of transactions, Warner-Lambert was merged into Pfizer. Therefore, Warner-Lambert may be served by serving Pfizer as indicated above.

Defendant Watson City Drug is a pharmacy business with its principal place of business located at 192 South 7th Street, Raymondville, Texas 78580. The defendant may be served with citation by leaving a copy of the citation at the principal place of business during office hours.

Defendant Rajiv Finga, M.D. ("Finga") is a licensed physician in the practice of medicine representing and holding himself out to the public as being a competent and

skilled practitioner of medicine; and as being able to diagnose, treat, and skillfully perform, in particular, those medical services such as were required by the Plaintiff, Juanita Blanco. Defendant Finga is a citizen of the State of Texas, and was a citizen of the State of Texas at the times that the causes that are the basis of this suit accrued. He may be served with process by serving him at his place of business: 637 E. Hidalgo, Raymondville, Texas 78580.

Defendant Mark Edwards, M.D. ("Edwards") is a licensed physician in the practice of medicine representing and holding himself out to the public as being a competent and skilled practitioner of medicine; and as being able to diagnose, treat, and skillfully perform, in particular, those medical services such as were required by the Plaintiff, Ruben Garcia. Defendant Edwards is a citizen of the State of Texas, and was a citizen of the State of Texas at the times that the causes that are the basis of this suit accrued. He may be served with process by serving him at his place of business: 2102 Pease, Harlingen, Texas 78550.

Defendant George Cantu, M.D. ("Cantu") is a licensed physician in the practice of medicine representing and holding himself out to the public as being a competent and skilled practitioner of medicine; and as being able to diagnose, treat, and skillfully perform, in particular, those medical services such as were required by the Plaintiff, Nicolas Rodriguez. Defendant Cantu is a citizen of the State of Texas, and was a citizen of the State of Texas at the times that the causes that are the basis of this suit accrued. He may be served with process by serving him at his place of business: 322 Petra Ave., Raymondville, Texas 78580.

Defendant Allen B. Spence, M.D. ("Spence") is a licensed physician in the practice

of medicine representing and holding himself out to the public as being a competent and skilled practitioner of medicine; and as being able to diagnose, treat, and skillfully perform, in particular, those medical services such as were required by Maria Inez Ruiz. Defendant Spence is a citizen of the State of Texas, and a resident of Willacy County, Texas, and was a citizen of the State of Texas and a resident of Willacy County, Texas at the times that the causes that are the basis of this suit accrued. He may be served with process by serving him at his place of business: 336 S. 8th Street, Raymondville, Texas 78580.

III.

## Venue

Plaintiffs' causes of action against Defendants include causes of action which accrued, in whole or in part, in Willacy County, Texas, within the meaning of TEX. CIV. PRAC. & REM. C. § 15.002(a)(1) because Plaintiffs, who reside in Willacy County, Texas has sustained, and has continued to sustain, bodily injuries while residing in Willacy County, Texas as the proximate results of the conduct of Defendants made subjects of this cause.

Plaintiffs' causes of action against Defendants include causes of action against Defendants Rajiv Finga, M.D., Mark Edwards, M.D., George Cantu, M.D., and Allen B. Spence, M.D., who reside and resided in Willacy County, Texas, at all times relevant hereto within the meaning of TEX. CIV. PRAC. & REM. C. § 15.002(a)(2).

Plaintiffs' causes of action against Defendants include causes of action arising out of transactions solicited in Willacy County, Texas by Defendants, or their authorized agents, within the meaning of TEX. BUS. & COM. C. § 17.56.

Plaintiffs' causes of action against Defendants include causes of action of Plaintiffs for breach of warranty by a manufacturer of consumer goods, within the meaning of TEX. CIV. PRAC. & REM. C. § 15.033.

Venue is therefore proper in Willacy County, Texas pursuant to TEX. CIV. PRAC. & REM. C. §§15.002(a)(1), 15.005, and 15.033.

## IV.

### Factual Allegations

Defendant Warner-Lambert, now Defendant Pfizer, Inc., was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, advertising, sales, promotion, importation, and/or distribution of pharmaceutical products, including the drug Rezulin (Troglitazone), for ultimate sale and/or use in the United States of America, including but not limited to the State of Texas as well as in various foreign jurisdictions.

The drug Rezulin (Troglitazone) was marketed by defendant Warner-Lambert, now Defendant Pfizer, Inc., as being able to help the human body respond more effectively to insulin, so cells can absorb blood sugar, or glucose, that might otherwise lead to high blood sugar levels. Rezulin (Troglitazone) is used in the treatment of Type 2 Diabetes. Defendants claimed that with Rezulin (Troglitazone), a Type 2 Diabetic may be able to decrease or even eliminate insulin injections.

At all times material hereto, defendants Warner-Lambert and Pfizer were acting by and through their agents, servants and/or employees, each of whom were acting within the course and scope of their employment with the actual or apparent authority of Defendants Warner-Lambert and Pfizer.

Between 1997 and 2000, Juanita Blanco presented herself to the clinic of Dr. Rajiv Finga for consultation.  Dr. Finga and/or persons under his control prescribed the drug Rezulin (Troglitazone) to Ms. Blanco to be taken daily as part of her diabetes treatment regimen.  She filled the prescription for Rezulin and purchased the medication at Watson's City Drug located in Raymondville, Willacy County, Texas.  Thereafter the drug Rezulin became part of Plaintiff's diabetic treatment regimen.  She took this drug on a daily basis in Willacy  County.  Defendants Warner-Lambert, now Pfizer, Inc. The drug Rezulin (Troglitazone) taken by Ms. Blanco was not substantially changed or altered after it left the control of Defendants Warner-Lambert, now Pfizer, Inc.  Ms. Blanco has severe and permanent liver damage as a direct result of her use of the drug Rezulin (Troglitazone).

Between 1997 and 2000, Ruben Garcia presented himself to the clinic of Dr. Mark Edwards for consultation.  Dr. Edwards and/or persons under his control prescribed the drug Rezulin (Troglitazone) to Mr. Garcia to be taken daily as part of his diabetes treatment regimen.  Thereafter the drug Rezulin became part of Plaintiff's diabetic treatment regimen.  He took this drug on a daily basis in Willacy County.  Defendants Warner-Lambert, now Pfizer, Inc. The drug Rezulin (Troglitazone) taken by Mr. Garcia was not substantially changed or altered after it left the control of Defendants Warner-Lambert, now Pfizer, Inc.  Mr. Garcia has severe and permanent liver damage as a direct result of his use of the drug Rezulin (Troglitazone).

Between 1997 and 2000, Nicolas Rodriguez presented himself to the clinic of Dr. George Cantu for consultation.  Dr. Cantu and/or persons under his control prescribed the drug Rezulin (Troglitazone) to Mr. Rodriguez to be taken daily as part of his diabetes

treatment regimen.  Thereafter the drug Rezulin became part of Plaintiff's diabetic

treatment regimen.  He filled the prescription for Rezulin and purchased the medication at

Watson's City Drug located in Raymondville, Willacy County, Texas. He took this drug on

a daily basis in Willacy County.  The drug Rezulin (Troglitazone) taken by Mr. Rodriguez

was not substantially changed or altered after it left the control of Defendants Warner-

Lambert, now Pfizer, Inc.  Mr. Rodriguez  has severe and permanent liver damage as a

direct result of his use of the drug Rezulin (Troglitazone).

Between 1997 and 2000, Maria Inez Ruiz presented herself to the clinic of Dr.

Allen B. Spence for consultation.  Dr. Spence and/or persons under his control prescribed

the drug Rezulin (Troglitazone) to Ms. Ruiz to be taken daily as part of her diabetes

treatment regimen.  She filled the prescription for Rezulin and purchased the medication at

Watson's City Drug located in Raymondville, Willacy County, Texas. Thereafter the drug

Rezulin became part of her diabetic treatment regimen.  She took this drug on a daily basis

in Willacy County.  The drug Rezulin (Troglitazone) taken by Ms. Ruiz was not

substantially changed or altered after it left the control of Defendants Warner-Lambert,

now Pfizer, Inc.  Ms. Ruiz had severe and permanent liver damage as a direct result of her

use of the drug Rezulin (Troglitazone), and subsequently died.

V.

### Strict Liability - Design Defect Against
### Defendants Warner-Lambert, Pfizer, and Watson's City Drug

Defendants Warner-Lambert, Pfizer, and Watson's City Drug  sold Rezulin

(Troglitazone) in the course of defendants' business.  Rezulin (Troglitazone) was then in a

defective condition and unreasonably dangerous when put to a reasonably anticipated use. Rezulin (Troglitazone) was used in a manner reasonably anticipated and Plaintiffs were damaged as a direct result of such defective condition as existed when the Rezulin (Troglitazone) was sold. All of these events occurred despite safer alternative designs (Pioglitazone Hydrochloride and Rosiglitazone Maleate) being economically and technologically feasible alternatives that would have significantly reduced the risk of hepatotoxicity.

Such defective condition as existed when the drug Rezulin (Troglitazone) was sold by the defendants was a producing cause of Plaintiffs severe and permanent physical injuries and damages. The aforesaid acts and omissions of Defendants Warner-Lambert and Pfizer show complete indifference to and a conscious disregard for the safety of others, especially Plaintiffs, thereby entitling Plaintiffs to exemplary damages.

VI.

## Breach of Common Law Implied Warranties
## Against Defendants Warner-Lambert, Pfizer, and Watson's City Drug

Defendants Warner-Lambert, Pfizer, and Watson's City Drug designed, manufactured, produced, labeled, advertised, tested, inspected, shipped, distributed, and/or sold the drug Rezulin (Troglitazone) in the course of their business for human consumption. Plaintiffs were administered Rezulin (Troglitazone).

Rezulin (Troglitazone), when sold by defendants, was not fit for human consumption due to the risks and dangers it presented. In particular, the Defendants breached the implied warranty of fitness for a particular purpose and the implied warranty

of merchantability.

As a proximate result thereof, Plaintiffs were damaged.

VII.

## Negligence of Defendants Warner-Lambert and Pfizer

Defendants Warner-Lambert and Pfizer had a legal responsibility and duty to conform to pharmaceutical industry standards, to possess the knowledge of an expert in the industry, and to foresee risks inherent with their products under the same or similar circumstances as other members of the industry. Defendants Warner-Lambert and Pfizer breached this duty, as aforementioned, and were negligent or failed to use ordinary care in the particulars set forth herein.

As a direct and proximate result of the aforementioned negligence, or failure to use ordinary care, Plaintiffs suffered the aforementioned injuries and damages.

VIII.

## Violations of the Texas Deceptive Trade
## Practices -- Consumer Protection Act

Defendants Warner-Lambert and Pfizer designed, manufactured, produced, labeled, advertised, tested, inspected, shipped, distributed, and/or sold the drug Rezulin (Troglitazone) in the course of their business for human consumption. Plaintiffs were administered Rezulin (Troglitazone).

Defendants Warner-Lambert and Pfizer engaged in conduct which violated TEX. BUS. & COM. C. §§ 17.46(a), 17.46(b)(5), 17.46(b)(7), & 17.46(b)(23), and which was a producing cause of Plaintiffs' damages. Moreover, such conduct was committed by these

Defendants knowingly, within the meaning of TEX. BUS. & COM. C. § 17.45(9), and

such conduct was committed by these Defendants intentionally, within the meaning of

TEX. BUS. & COM. C. § 17.45(13).

Defendants Warner-Lambert and Pfizer also engaged in conduct which was

unconscionable, within the meaning of TEX. BUS. & COM. C. § 17.45(5), and which was

a producing cause of Plaintiffs' damages.  Moreover, such conduct was committed by these

Defendants knowingly, within the meaning of TEX. BUS. & COM. C.

§17.45(9), and such conduct was committed by these Defendants intentionally, within the

meaning of TEX. BUS. & COM. C. § 17.45(13).

IX.

### Felonious Conduct of Defendants Warner-Lambert and Pfizer

Defendants Warner-Lambert and Pfizer intentionally and/or knowingly caused

serious bodily injury to Plaintiffs within the meaning of TEX. PEN. C. §22.02(a)(1)

through the sale, distribution, and other conduct relating to Rezulin described herein.

Defendant Warner-Lambert and Pfizer intentionally and/or knowingly caused the

fraudulent destination, removal, or concealment of a writing within the meaning of TEX.

PEN. C. § 32.47 through the sale, distribution, and other conduct relating to Rezulin

described herein.

As a direct and proximate result of such conduct, Plaintiffs suffered severe and

permanent injuries and damages.

## X.

### Negligence of and Breach of Express Warranty by Defendants Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence

Defendants Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence had a duty to possess and use that degree of skill and learning ordinarily used under the same or similar circumstances by members of their profession in the treatment of Plaintiffs. During the course of their treatment of Plaintiffs, Defendants Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence breached their duty and committed the following acts and omissions of negligence which resulted from their failure to meet these standards of due care, skill, and practice required by members of their profession:

a.  Defendants Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence, and/or persons under their control, negligently and carelessly failed to exercise reasonable care in the selection of the drug Rezulin (Troglitazone) and failed to familiarize themselves with the risks of the drug prior to prescribing it;

b.  Defendants Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence, and/or persons under their control, negligently and carelessly ordered that the drug Rezulin (Troglitazone) be administered to Plaintiffs without first investigating and utilizing all other means available for their glycemic control;

c.  Defendants Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence, and/or persons under their control, negligently and carelessly failed to

properly and timely monitor, diagnose and treat Plaintiffs before and while they were on the drug Rezulin (Troglitazone).

Additionally, Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence, and/or persons under their control, made express warranties and expressly warranted to Plaintiffs that Rezulin (Troglitazone) was safe, effective, and well-accepted by patients. Subsequently, it was determined that Plaintiffs had suffered severe liver injuries as a result of their use of Rezulin (Troglitazone). Defendants Rajiv Finga, Mark Edwards, George Cantu, and Allen B. Spence, and/or persons under their control, breached express warranties made to Plaintiffs.

As a direct and proximate result of the aforementioned matters, Plaintiffs were caused to sustain severe and permanent injuries and damages.

Plaintiffs have fully complied with all conditions precedent to filing this suit on these claims, including full compliance with Vernon's Ann. Civ. St. Art. 4590i, subchapter D, §4.01.

## XI.

## **Damages**

As a result of Warner-Lambert, Pfizer, and Watson's City Drug's design, manufacture, sale, shipment and/or distribution of the drug Rezulin (Troglitazone) in an unreasonably dangerous and defective condition, and/or as a result of Warner-Lambert, Pfizer, Watson's City Drug's breach of the implied warranty of fitness for a particular purpose and the implied warranty of merchantability, and/or as a result of the negligence of defendants Warner-Lambert, Pfizer, Rajiv Finga, Mark Edwards, George Cantu, and Allen

B. Spence, and/or as result of the breach of express warranty of Defendants Rajiv Finga,

Mark Edwards, George and Cantu, and Allen B. Spence, Plaintiffs claims damages as

follows:

    a.      Plaintiffs were caused to sustain severe, permanent physical injuries as a

result of using the drug Rezulin (Troglitazone);

    b.      Plaintiffs will require ongoing medical care and monitoring as a result of

their damages caused by the Rezulin (Troglitazone);

    c.      Plaintiffs are lawfully entitled to such damages as are fair and just for the

injuries they sustained, as well as loss of quality of life;

    d.      Plaintiffs were required to and did obtain the services of doctors, hospitals,

nurses, and health care personnel, and was required to and did receive drugs,

medicines, x-rays, laboratory testing, monitoring, diagnostic imaging, and

medical treatment and Plaintiffs will continue to require and receive the

services of such doctors, hospitals, nurses, health care personnel and drugs,

medicines, laboratory testing, monitoring and medical care and treatment for

the remainder of their life;

    a.      Plaintiffs were required to expend sums of money and incur bills for medical

care, doctors, hospitals, nurses, health care personnel, drugs, medicines, x-

rays, diagnostic imaging, laboratory testing, monitoring, medical treatment

and will in the future be required to expend various amounts for such items

and services; and

    f.      Plaintiffs have suffered, still suffers, and will continue to suffer from

physical pain, mental anguish, physical impairment, disfigurement, and

inability to function and enjoy life and pleasure as they had prior to their use

of the drug Rezulin and their resulting injuries and damages.

      1.)     Physical pain and mental anguish.

      2.)     Medical Expenses.

      3.)     Physical impairment.

      4.)     Disfigurement.

      5.)     Mental anguish, past and future.

      6.)     Pecuniary loss, past and future.

      7.)     Loss of companionship and society, past and future.

g.     Damages relating to Ms. Maria Inez Ruiz

      1.      Physical pain and mental anguish.

      2..)     Mental Expenses.

      3.)     Physical impairment

      4.)     Disfigurement.

      5.)     Funeral and burial expenses.

h.     Hermelinda Quiroga, Individually

      1..)     Mental anguish, past and future.

      2.)     Pecuniary loss, past and future.

      3.)     Loss of companionship and society, past and future.

## XII.

## Conscious Disregard for Human Safety on the part of
## Defendants Warner-Lambert and Pfizer

The Plaintiffs claim exemplary damages of and from Defendants Warner-Lambert and Pfizer due to their conduct which amounts to fraud within the meaning of TEX. CIV. PRAC. & REM. C. § 41.001(6); and due to their conduct which amounts to malice within the meaning of TEX. CIV. PRAC. & REM. C. § 41.001(7)(A) and/or §41.001(7)(B).

The Plaintiffs further claim an additional award of penalty damages of up to three (3) times their actual damages pursuant to TEX. BUS. & COM. C. §17.50.

Finally, the Plaintiffs specifically invoke the provisions of TEX. CIV. PRAC. & REM. C. § 41.008(c)(4) and 41.008(c)(12) states that exemplary damages in this case should be found by the jury through the guidance provided by TEX. CIV. PRAC. & REM. C. §41.011 and should be limited in amount only by the jury's collective wisdom and good judgment and sensibilities.

## XIII.

## Tolling

The expiration of periods, within which Plaintiffs' actions herein must be commenced under applicable statutes of limitations, has been tolled due to fraudulent concealment by Defendants.

The expiration of periods, within which Plaintiffs' actions herein must be commenced under applicable statutes of limitations, has been tolled due to Plaintiffs not having had knowledge of such facts as would cause a reasonably prudent person to make

inquiry leading to discovery of Plaintiffs' causes of action against Defendants.

The expiration of periods, within which Plaintiffs' actions herein must be commenced under applicable statutes of limitations, has been tolled due to pendency of related class action cases.

The expiration of periods, within which Plaintiffs' actions herein must be commenced under applicable statutes of limitations, has been tolled due to the existence of a written agreement between the parties tolling the applicable statute(s) of limitations.

## XIV.

### Jury Demand

Plaintiffs request that a jury of their peers be convened to determine the factual issues in this cause, and they have already tendered to the Clerk of this Court the statutory jury application fee of $30.00 pursuant to TEX. R. CIV. P. 216.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that the Defendants be cited to appear and answer in this cause, and that upon final trial hereof the Plaintiffs recover judgment against the Defendants, jointly and severally for compensatory damages, and jointly and/or severally for statutory penalty damages, exemplary damages, and attorney's fees in amounts in excess of the jurisdictional minimum of this Court, pre-judgment interest and post-judgment interest on all such sums at the maximum lawful rates, costs of court, and such other and further relief, both general and special, and at law or in equity, to which the Plaintiffs may show themselves justly entitled to receive.

Respectfully submitted,

**GALLAGHER, LEWIS, DOWNEY
   & KIM**
700 Louisiana Street, 40th Floor
Houston, Texas  77002
(713) 222-8080
(713) 222-0066 [Fax]
Mr. Michael T. Gallagher
State Bar No. 07586000
Mr. John H. Kim
State Bar No. 00784393

**FLORES, CASSO & PETTITT, L.L.P.**
321 South 12th Street
Post Office Box 2128
McAllen, Texas 78505-2128
Tel: (956) 686-9591
Fax:(956) 686-9478

By: _____
     David Casso
     State Bar No. 03980250

**ATTORNEY FOR PLAINTIFFS
JUANITA BLANCO, RUBEN
GARCIA, NICOLAS RODRIGUEZ
AND HERMELINDA QUIROGA,
INDIVIDUALLY AND ON BEHALFOF
 THE ESTATE OF MARIA INEZ RUIZ**

## CERTIFICATE OF SERVICE

I, David Casso, hereby certify that on the 30th day of June, 2003, the foregoing Plaintiffs' First Amended Petition was served on all known counsel, to-wit:

Mr. Jack E. Urquhart
BEIRNE, MAYNARD & PARSONS, L.L.P.
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056-3000

Mr. David C Garza
GARZA & GARZA
680 East St. Charles, Suite 300
Brownsville, Texas   78522

David Casso

# Exhibit 7



# PHYSICIANS' DESK REFERENCE®

## Supplement A

For important errata, turn the page.

---

## IMPORTANT NOTICE

Supplements to PHYSICIANS' DESK REFERENCE are published twice yearly to provide readers with significant revisions of existing product listings as well as comprehensive information on new drugs and other products not included in the current annual edition. Before prescribing or administering any product described in PHYSICIANS' DESK REFERENCE, be sure to consult this supplement to determine whether revisions have occurred since the 1998 edition of PDR went to press.

---

Copyright © 1998 and published by Medical Economics Company at Montvale, NJ 07645-1742. All rights reserved. None of the content of this publication may be reproduced, stored in a retrieval system, resold, redistributed, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording, or otherwise) without the prior written permission of the publisher. PHYSICIANS' DESK REFERENCE®, PDR®, PDR For Nonprescription Drugs®, PDR For Ophthalmology®, Pocket PDR®, and The PDR® Family Guide to Prescription Drugs® are registered trademarks used herein under license. PDR Generics™, PDR® Medical Dictionary™, PDR® Nurse's Handbook™, PDR® Nurse's Dictionary™, PDR Companion Guide™, PDR® Atlas of Anatomy, The PDR® Family Guide to Women's Health and Prescription Drugs™, PDR® Drug Interactions/Side Effects/Indications/Contraindications Diskettes™, PDR® Electronic Library™, The PDR® Family Guide to Nutrition and Health™, The PDR® Family Guide Encyclopedia of Medical Care™, and The PDR® Family Guide to Over-the-Counter Drugs™ are trademarks used herein under license.

This supplement is a compilation of information submitted by the products' manufacturers. Each entry has been prepared, edited, and approved by the manufacturer's medical department, medical director, and/or medical consultant. The publisher does not warrant or guarantee any of the products described herein or perform any independent analysis in connection with the product information contained herein.

Officers of Medical Economics Company: President and Chief Executive Officer: Curtis B. Allen; Vice President, New Media: Suzanne L. BeDell; Vice President, Corporate Human Resources: Pamela M. Bilash; Vice President and Chief Information Officer: Steven M. Bressler; Senior Vice President, Finance, and Chief Financial Officer: Thomas W. Ehardt; Vice President, Directory Services: Stephen B. Greenberg; Vice President, New Business Planning: Linda G. Hope; Executive Vice President, Database Publishing: Thomas J. Kelly; Senior Vice President, Group Publisher: Lee A. Maniscalco; Vice President, Group Publisher: Terrance W. Meacock; Vice President, Production: David A. Pitler; Vice President, Group Publisher: Thomas C. Pizor; Executive Vice President, Magazine Publishing: Thomas F. Rice; Senior Vice President, Operations: John ...are.

938

| TABLE 4. Adverse Events in Placebo-Controlled Studies (% of Patients) | | | | | |
|---|---|---|---|---|---|
| BODY SYSTEM/ Adverse Event | Placebo N = 270 | Atorvastatin 10 mg N = 863 | Atorvastatin 20 mg N = 36 | Atorvastatin 40 mg N = 79 | Atorvastatin 80 mg N = 94 |
| **BODY AS A WHOLE** | | | | | |
| Infection | 10.0 | 10.3 | 2.8 | 10.1 | 7.4 |
| Headache | 7.0 | 5.4 | 16.7 | 2.5 | 6.4 |
| Accidental Injury | 3.7 | 4.2 | 0.0 | 1.3 | 3.2 |
| Flu Syndrome | 1.9 | 2.2 | 0.0 | 2.5 | 3.2 |
| Abdominal Pain | 0.7 | 2.8 | 0.0 | 3.8 | 2.1 |
| Back Pain | 3.0 | 2.8 | 0.0 | 3.8 | 1.1 |
| Allergic Reaction | 2.6 | 0.9 | 2.8 | 1.3 | 0.0 |
| Asthenia | 1.9 | 2.2 | 0.0 | 3.8 | 0.0 |
| **DIGESTIVE SYSTEM** | | | | | |
| Constipation | 1.8 | 2.1 | 0.0 | 2.5 | 1.1 |
| Diarrhea | 1.5 | 2.7 | 0.0 | 1.3 | 5.3 |
| Dyspepsia | 4.1 | 2.3 | 2.8 | 1.3 | 2.1 |
| Flatulence | 3.3 | 2.1 | 2.8 | 1.3 | 1.1 |
| **RESPIRATORY SYSTEM** | | | | | |
| Sinusitis | 2.6 | 2.8 | 0.0 | 2.5 | 6.4 |
| Pharyngitis | 1.6 | 2.5 | 0.0 | 1.3 | 2.1 |
| **SKIN AND APPENDAGES** | | | | | |
| Rash | 0.7 | 3.9 | 2.8 | 3.8 | 1.1 |
| **MUSCULOSKELETAL SYSTEM** | | | | | |
| Arthralgia | 1.5 | 2.0 | 0.0 | 5.1 | 0.0 |
| Myalgia | 1.1 | 3.2 | 5.6 | 1.3 | 0.0 |

**Nursing Mothers**
Nursing rat pups had plasma and liver drug levels of 50% and 40%, respectively, of that in their mother's milk. Because of the potential for adverse reactions in nursing infants, women taking Lipitor should not breast-feed (see CONTRAINDICATIONS).

**Pediatric Use**
Treatment experience in a pediatric population is limited to doses of Lipitor up to 80 mg/day for 1 year in 8 patients with homozygous FH. No clinical or biochemical abnormalities were reported in these patients. None of these patients was below 9 years of age.

**Geriatric Use**
Treatment experience in adults age ≥70 years with doses of Lipitor up to 80 mg/day has been evaluated in 221 patients. The safety and efficacy of Lipitor in this population were similar to those of patients <70 years of age.

**ADVERSE REACTIONS**
Lipitor is generally well-tolerated. Adverse reactions have usually been mild and transient. In controlled clinical studies of 2502 patients, <2% of patients were discontinued due to adverse experiences attributable to atorvastatin. The most frequent adverse events thought to be related to atorvastatin were constipation, flatulence, dyspepsia, and abdominal pain.

**Clinical Adverse Experience**
Adverse experiences reported in ≥2% of patients in placebo-controlled clinical studies of atorvastatin, regardless of causality assessment, are shown in Table 4.

(See table above)

The following adverse events were reported, regardless of causality assessment in patients treated with atorvastatin in clinical trials. The events in italics occurred in ≥2% of patients and the events in plain type occurred in <2% of patients.

**Body as a Whole:** Chest pain, face edema, fever, neck rigidity, malaise, photosensitivity reaction, generalized edema.
**Digestive System:** Nausea, gastroenteritis, liver function tests abnormal, colitis, vomiting, gastritis, dry mouth, rectal hemorrhage, esophagitis, eructation, glossitis, mouth ulceration, anorexia, increased appetite, stomatitis, biliary pain, cheilitis, duodenal ulcer, dysphagia, enteritis, melena, gum hemorrhage, stomach ulcer, tenesmus, ulcerative stomatitis, hepatitis, pancreatitis, cholestatic jaundice.
**Respiratory System:** Bronchitis, rhinitis, pneumonia, dyspnea, asthma, epistaxis.
**Nervous System:** Insomnia, dizziness, paresthesia, somnolence, amnesia, abnormal dreams, libido decreased, emotional lability, incoordination, peripheral neuropathy, torticollis, facial paralysis, hyperkinesia, depression, hyperesthesia, hypertonia.
**Musculoskeletal System:** Arthritis, leg cramps, bursitis, tenosynovitis, myasthenia, tendinous contracture, myositis.
**Skin and Appendages:** Pruritus, contact dermatitis, alopecia, dry skin, sweating, acne, urticaria, eczema, seborrhea, skin ulcer.
**Urogenital System:** Urinary tract infection, urinary frequency, cystitis, hematuria, impotence, dysuria, kidney calculus, nocturia, epididymitis, fibrocystic breast, vaginal hemorrhage, albuminuria, breast enlargement, metrorrhagia, nephritis, urinary incontinence, urinary retention, urinary urgency, abnormal ejaculation, uterine hemorrhage.
**Special Senses:** Amblyopia, tinnitus, dry eyes, refraction disorder, eye hemorrhage, deafness, glaucoma, parosmia, taste loss, taste perversion.
**Cardiovascular System:** Palpitation, vasodilatation, syncope, migraine, postural hypotension, phlebitis, arrhythmia, angina pectoris, hypertension.
**Metabolic and Nutritional Disorders:** Peripheral edema, hyperglycemia, creatine phosphokinase increased, gout, weight gain, hypoglycemia.
**Hemic and Lymphatic System:** Ecchymosis, anemia, lymphadenopathy, thrombocytopenia, petechia.
**Postintroduction Reports**
Adverse events associated with Lipitor that have been received since market introduction, that are not listed above, and that may have no causal relationship to drug include the following: angioneurotic edema.

**OVERDOSAGE**
There is no specific treatment for atorvastatin overdosage. In the event of an overdose, the patient should be treated symptomatically, and supportive measures instituted as required. Due to extensive drug binding to plasma proteins, hemodialysis is not expected to significantly enhance atorvastatin clearance.

**DOSAGE AND ADMINISTRATION**
The patient should be placed on a standard cholesterol-lowering diet before receiving Lipitor and should continue on this diet during treatment with Lipitor.

Hypercholesterolemia (Heterozygous Familial and Nonfamilial) and Mixed Dyslipidemia (Fredrickson Types IIa and IIb)

The recommended starting dose of Lipitor is 10 mg once daily. The dosage range is 10 to 80 mg once daily. Lipitor can be administered as a single dose at any time of the day, with or without food. Therapy should be individualized according to goal of therapy and response (see NCEP Guidelines, summarized in Table 3). After initiation and/or upon titration of Lipitor, lipid levels should be analyzed within 2 to 4 weeks and dosage adjusted accordingly.

Since the goal of treatment is to lower LDL-C, the NCEP recommends that LDL-C levels be used to initiate and assess treatment response. Only if LDL-C levels are not available, should total-C be used to monitor therapy.

Homozygous Familial Hypercholesterolemia
The dosage of Lipitor in patients with homozygous FH is 10 to 80 mg daily. Lipitor should be used as an adjunct to other lipid-lowering treatments (eg, LDL apheresis) in these patients or if such treatments are unavailable.

Concomitant Therapy
Atorvastatin may be used in combination with a bile acid binding resin for additive effect. The combination of HMG-CoA reductase inhibitors and fibrates should generally be avoided (see WARNINGS, Skeletal Muscle, and PRECAUTIONS, Drug Interactions for other drug-drug interactions).

Dosage in Patients With Renal Insufficiency
Renal disease does not affect the plasma concentrations nor

**HOW SUPPLIED**
Lipitor is supplied as white, elliptical, film-coated tablets of atorvastatin calcium containing 10, 20, and 40 mg atorvastatin.

10 mg tablets: coded "PD 155" on one side and "10" on the other.
NODD71-0155-23 bottles of 90
NODD71-0155-34 bottles of 5000
NODD71-0155-10 10 x 10 unit-dose blisters

20 mg tablets: coded "PD 156" on one side and "20" on the other.
NODD71-0156-23 bottles of 90
NODD71-0156-10 10 x 10 unit-dose blisters

40 mg tablets: coded "PD 157" on one side and "40" on the other.
NODD71-0157-23 bottles of 90

Storage
Store at controlled room temperature 20°C to 25°C (68°F to 77°F) (see USP).

Caution—Federal law prohibits dispensing without prescription.

Revised December 1997

Manufactured by:
Warner-Lambert Export, Ltd. © 1997
Dublin, Ireland

For
PARKE-DAVIS
Div of Warner-Lambert Co
Morris Plains, NJ 07950 USA
MADE IN GERMANY

Marketed by:
PARKE-DAVIS
Div of Warner-Lambert Co and
PFIZER Inc.
New York, NY 10017

0155G024

**PROCANBID™**
(Procainamide Hydrochloride)
Extended-Release Tablets
*Procanbid is not USP for dissolution.

Prescribing information for this product, which appears on pages 2116-2118 of the 1998 PDR, has been revised as follows. Please write "See Supplement A" next to the product heading.

In the DESCRIPTION section, in the third paragraph delete the fifth sentence beginning with "The 500-mg tablet..."

In the HOW SUPPLIED section, the first paragraph, the 500 mg tablet, delete the word "Blue" and replace with "White".

At the end of the product listing, the revision date, copyright date and code number have changed and should read as follows:

September 1997
©1997, Warner-Lambert Co.                              0562G090

**REZULIN®**
(Troglitazone) Tablets

Prescribing information for this product, which appears on pages 2118-2121 of the 1998 PDR, has been completely revised as follows. Please write "See Supplement A" next to the product heading.

**WARNINGS**
Hepatic
Rare cases of severe idiosyncratic hepatocellular injury have been reported during marketed use (see ADVERSE REACTIONS). The hepatic injury is usually reversible, but very rare cases of hepatic failure, leading to death or liver transplant, have been reported. Injury has occurred after both short- and long-term troglitazone treatment.

During all clinical studies in North America, a total of 48 of 2510 (1.9%) Rezulin-treated patients and 3 of 475 (0.6%) placebo-treated patients had ALT levels greater than 3 times the upper limit of normal. Twenty of the Rezulin-treated and none of the

## Rezulin—Cont.

treated patients developed reversible jaundice; one of these patients had a liver biopsy which was consistent with an idiosyncratic drug reaction. An additional Rezulin-treated patient had a liver biopsy which was also consistent with an idiosyncratic drug reaction. (See ADVERSE REACTIONS, Laboratory Abnormalities).

It is recommended that serum transaminase levels be checked at the start of therapy, monthly for the first six months of therapy, every two months for the remainder of the first year of troglitazone therapy, and periodically thereafter. Liver function tests also should be obtained for patients at the first symptoms suggestive of hepatic dysfunction, eg, nausea, vomiting, abdominal pain, fatigue, anorexia, dark urine. Rezulin therapy should not be initiated if the patient exhibits clinical or laboratory evidence of active liver disease (eg, ALT>3 times the upper limit of normal) and should be discontinued if the patient has jaundice or laboratory measurements suggest liver injury (eg, ALT>3 times the upper limit of normal).

### DESCRIPTION

Rezulin® (troglitazone) is an oral antihyperglycemic agent which acts primarily by decreasing insulin resistance. Rezulin is used in the management of type II diabetes (noninsulin-dependent diabetes mellitus (NIDDM) also known as adult-onset diabetes). It improves sensitivity to insulin in muscle and adipose tissue and inhibits hepatic gluconeogenesis. Troglitazone (±)-5-[[4-(3,4-dihydro-6-hydroxy-2,5,7,8-tetramethyl-2H-1-benzopyran-2-yl)methoxy]phenyl]methyl]-2,4-thiazolidinedione) is not chemically or functionally related to either the sulfonylureas, the biguanides, or the α-glucosidase inhibitors. The molecule contains 2 chiral centers, with each of the 4 stereoisomers having similar pharmacologic effects. The structural formula is as shown:



Troglitazone is a white to yellowish crystalline compound; it may have a faint, characteristic odor. Troglitazone has a molecular formula of $C_{24}H_{27}NO_5S$ and a molecular weight of 441.56 daltons. It is soluble in N,N-dimethylformamide or acetone; sparingly soluble in ethyl acetate; slightly soluble in acetonitrile, ethanol, or ether; and practically insoluble in water.

Rezulin is available as 200, 300 and 400 mg tablets for oral administration formulated with the following excipients: croscarmellose sodium, hydroxypropyl methylcellulose, magnesium stearate, hydroxypropyl cellulose, polyethylene glycol 400, povidone 80, povidone, purified water, silicon dioxide, titanium dioxide, and synthetic iron oxides.

### CLINICAL PHARMACOLOGY

**Mechanism of Action**

Troglitazone is a thiazolidinedione antidiabetic agent that lowers blood glucose by improving target cell response to insulin. It has a unique mechanism of action that is dependent on the presence of insulin for activity. Troglitazone decreases hepatic glucose output and increases insulin-dependent glucose disposal in skeletal muscle. Its mechanism of action is thought to involve binding to nuclear receptors (PPAR) that regulate the transcription of a number of insulin responsive genes critical for the control of glucose and lipid metabolism. Unlike sulfonylureas, troglitazone is not an insulin secretagogue.

In animal models of diabetes, troglitazone reduces the hyperglycemia, hyperinsulinemia, and hypertriglyceridemia characteristic of insulin-resistant states such as type II diabetes. Plasma lactate and ketone body formation are also decreased. The metabolic changes produced by troglitazone result from the increased responsiveness of insulin-dependent tissues and are observed in numerous animal models of insulin resistance. Treatment with troglitazone did not affect pancreatic weight, islet number or glucagon content, but did increase regranulation of the pancreatic beta cells in rodent models of insulin resistance.

Since troglitazone enhances the effects of circulating insulin (by decreasing insulin resistance), it does not lower blood glucose in animal models that lack endogenous insulin.

**Pharmacokinetics and Drug Metabolism**

Maximum plasma concentration (Cmax) and the area under plasma concentration-time curve (AUC) of troglitazone, in ···· ··· ··· ···· ···· ···· ··· ···

#### TABLE 1. Mean (±1 SD) Steady-State Pharmacokinetics of Troglitazone in 21 Normal Volunteers

| Dose (mg/day) | Cmax (µg/mL) | AUC (0-24) (µg·hr/mL) | CL/F* (mL/min) |
|---|---|---|---|
| 200 | 0.90 (0.35) | 7.4 (2.4) | 500 (187) |
| 400 | 1.51 (0.65) | 13.4 (5.5) | 601 (224) |
| 600 | 2.82 (1.03) | 22.1 (8.6) | 496 (155) |

*CL/F = Apparent oral clearance.

**Absorption:** Troglitazone is absorbed rapidly following oral administration; the time for maximum plasma concentration (tmax) occurs within 2 to 3 hours. Food increases the extent of absorption by 30% to 85%; thus Rezulin should be taken with a meal to enhance systemic drug availability.

**Distribution:** Mean apparent volume of distribution (V/F) of troglitazone following multiple-dose administration ranges from 10.5 to 26.5 L/kg of body weight. Troglitazone is extensively bound (>99%) to serum albumin. [14C]troglitazone partitions into red blood cells (~6% of whole blood radioactivity).

**Metabolism:** In 5 healthy male volunteers given a single 400 mg dose of [14C]troglitazone after 14 days of treatment with 400 mg troglitazone tablets, the major metabolites found in the plasma were the sulfate conjugate (Metabolite 1), followed by the quinone metabolite (Metabolite 3). Only 3.1% of the dose was detected in the urine; this was primarily in the form of glucuronide conjugate (Metabolite 2), which is present in negligible amounts in the plasma. In both normal volunteers and patients with type II diabetes, steady-state levels of Metabolite 1 are 6 to 7 times that of troglitazone and Metabolite 3.

Troglitazone incubated with expressed human P450 1A1, 1A2, 2A6, 2B6, 2C9, 2E1, and 3A4 in the presence and absence of known inhibitors of these enzymes showed no Metabolite 3 formation above levels in control samples. Studies in human microsomes suggest that Metabolite 3 is not subject to further metabolism by the major P450 isozymes. Troglitazone did not inhibit any of the major P450 enzymes at clinically relevant concentrations. The inhibitory characteristics of Metabolite 3 have not been investigated directly.

The results of human in vivo drug interaction trials suggest that troglitazone induces cytochrome P450 3A4 at clinically relevant doses (see Drug Interactions).

**Excretion:** Following oral administration of [14C]troglitazone, approximately 85% of the radioactivity is recovered in feces (85%) and urine (3%). Unchanged troglitazone is not recovered in urine following oral administration. Mean plasma elimination half-life of troglitazone ranges from 16 to 34 hours.

**Special Populations**

**Renal Insufficiency:** In patients with various degrees of renal function, the apparent clearance of total and unbound troglitazone and the plasma elimination half-life of troglitazone, Metabolite 1, and Metabolite 3 do not correlate with creatinine clearance. Time, dose adjustment in patients with renal dysfunction is not necessary (see DOSAGE AND ADMINISTRATION).

**Hepatic Insufficiency:** Troglitazone, Metabolite 1, and Metabolite 3 plasma concentrations in patients with chronic liver disease (Child-Pugh Grade B or C) were increased by approximately 30%, 400% and 100%, respectively, compared to those in healthy subjects without hepatic dysfunction. There was no change in plasma protein binding. No adverse events were noted in any group that were attributed to drug. However, Rezulin therapy should not be initiated if the patient exhibits clinical or laboratory evidence of active liver disease (eg, ALT>3 times the upper limit of normal); see WARNINGS.

**Geriatric:** Steady-state pharmacokinetics of troglitazone, Metabolite 1, and Metabolite 3 in healthy elderly subjects are comparable to those seen in young adults.

**Pediatric:** Pharmacokinetic data in the pediatric population are not available.

**Gender:** Plasma concentrations of troglitazone and its metabolites are similar in men and women.

**Ethnicity:** Pharmacokinetics of troglitazone and its metabolites are similar among various ethnic groups.

**Pharmacodynamics and Clinical Effects**

Clinical studies demonstrate that Rezulin improves insulin sensitivity in insulin-resistant patients. Rezulin increases insulin-dependent glucose disposal, reduces hepatic gluconeogenesis, and enhances cellular responsiveness to insulin and thus, improves dysfunctional glucose homeostasis. In patients with type II diabetes, the decreased insulin resistance produced by Rezulin causes decreases in serum glucose, plasma insulin, and hemoglobin $A_{1c}$. Unlike sulfonylureas, Rezulin does not stimulate insulin secretion. Addition of Rezulin to a sulfonylurea has a synergistic effect since both agents act to improve glucose tolerance by different but complementary mechanisms. These effects occur without weight loss and persist for 52 weeks of Rezulin treatment. In clinical trials of Rezulin as monotherapy or in combination, an increase in LDL (up to 13%), HDL (up to 16%), and total cholesterol (total-C) (up to 5%) occurred while total-C/HDL and LDL/HDL ratios did not change. The increase in total cholesterol is due to the increase in HDL and LDL cholesterol. Despite the observed increase in total and LDL cholesterol, ApoB fraction levels are not increased. Patients treated with Rezulin as monotherapy or in combination with other agents exhibited a reduction in fasting (-13% to -26%) and postprandial triglyceride levels. For patients on Rezulin and insulin, reduction in insulin doses may occur following Rezulin therapy and some attenuation of the triglyceride reduction may occur.

Pharmacokinetic estimates of systemic troglitazone exposure do not improve the prediction of pharmacodynamic response beyond that obtained based upon knowledge of the administered dose.

Rezulin has only been shown to exert its antihyperglycemic effect in the presence of insulin. Because Rezulin does not stimulate insulin secretion, hypoglycemia in patients treated with Rezulin alone is not to be expected. Because of this insulin-dependent mechanism of action, Rezulin should not be used in patients with type I diabetes.

**Clinical Studies**

**Combination With Sulfonylureas**

A 52-week, double-blind, placebo-controlled study of Rezulin and 12 mg micronized glyburide, alone and in combination, was conducted in patients with type II diabetes (N=552), who had failed to achieve adequate glycemic control (FSG of 224 mg/dL and $HbA_{1c}$ of 9.5%) with a micronized dose of a sulfonylurea. Patients randomized to receive micronized glyburide showed mean increases in FSG and $HbA_{1c}$. [See table 2 below]

#### TABLE 1. Combination Therapy With Glyburide: Percent of Patients Achieving Glycemic Control At End of Study (1 yr)

| Rezulin (mg) | 0 | 200 | 400 | 600 |
|---|---|---|---|---|
| Glyburide (mg) | 12 | 12 | 12 | 12 |
| $HbA_{1c}$ (%) | | | | |
| ≤7% | 1 | 22 | 21 | 41 |
| ≤8% | 10 | 33 | 33 | 60 |

#### TABLE 2. Combination Therapy With Glyburide: Mean Difference From 12 mg Micronized Glyburide Monotherapy (1 yr)

| | 200 mg Rezulin + Glyburide | 400 mg Rezulin + Glyburide | 600 mg Rezulin + Glyburide |
|---|---|---|---|
| FSG (mg/dL) | | | |
| Mean Baseline | 226 | 231 | 220 |
| Adjusted Mean Change From Baseline | -31 | -38 | -56 |
| From Glyburide | -54** | -61** | -79** |
| $HbA_{1c}$ (%) | | | |
| Mean Baseline | 9.5 | 9.7 | 9.5 |
| Adjusted Mean Change From Baseline | -0.7 | -0.9 | -1.8 |
| From Glyburide | -1.6** | -1.8** | -2.7** |
| Insulin (pU/mL) | | | |
| Mean Baseline | 28.2 | 24.9 | 25.4 |
| Adjusted Mean Change From Baseline | -1.8 | -5.9 | -6.1 |
| From Glyburide | -2.4 | -4.4** | -4.6** |

PARKE-DAVIS/A231

A combination of 200, 400, or 600 mg of Rezulin with micronized glyburide achieved lower levels of fasting plasma glucose and $HbA_{1c}$ levels than either agent achieved alone (see Tables 2 and 3). These improvements in glycemic control were associated with mean weight gains of 5.5 to 13.1 pounds. To eliminate weight as a confounding factor in this study, patients had been instructed to follow a diet to maintain current weight.

**Combination With Insulin**

Two clinical studies were conducted to evaluate the effects of Rezulin on glycemic control and insulin dose in patients with type II diabetes who were being treated with insulin. In one 6-month, double-blind, placebo-controlled study in insulin-treated type II diabetic patients receiving a mean of 73 (range 27-143) units/day of insulin with a mean baseline $HbA_{1c}$ of 9.42 (range 7.04-12.48), Rezulin (200, or 600 mg/day) or placebo was added to the insulin therapy. Investigators were instructed to reduce the insulin dose only if two consecutive ESGs were ≤100 mg/L. Rezulin-treated patients showed a significant (p<0.0001) reduction in $HbA_{1c}$ compared with patients who received placebo (see Table 4).

Thirty percent of patients treated with 200 mg Rezulin and 57% of patients treated with 600 mg Rezulin had an $HbA_{1c}$ value below 8% at the end of the study compared with 11% of placebo-treated patients. Accompanying this improvement in glycemic control was a significant (p<0.0001) decrease in exogenous insulin dosage of 15% in the 200 mg Rezulin treatment group and 42% in the 600 mg Rezulin treatment group compared with 11% in the placebo group. $HbA_{1c}$ values and insulin dose as a function of duration of Rezulin treatment are presented in Figures 1 and 2. (See table above)



FIGURE 1: Combination Therapy With Insulin, Mean Change From Baseline for $HbA_{1c}$



FIGURE 2: Combination Therapy With Insulin, Mean Change From Baseline for Insulin Doses

A second 6-month, double-blind, placebo-controlled study in insulin-treated type II diabetics who previously were poorly controlled on oral agents receiving 30 to 150+ units insulin/day assessed the use of Rezulin in reducing exogenous insulin dosage while improving glycemic control as measured by capillary blood glucose. Patients treated with 200 mg (N=75) and 400 mg (N=76) Rezulin had their insulin doses decreased by 41% and 58%,

respectively, compared to a reduction of insulin dose in the placebo group (N=71) of 14% while maintaining an improving glycemic control. Forty-seven percent of the patients in the 400 mg group decreased their insulin injections frequency to average from 2 to 1 injections per day, 19% of patients receiving placebo decreased their injection frequency; an average from 3 to 2 injections per day. Insulin therapy was discontinued in 15% of patients, in the 400 mg Rezulin group compared to 7% in the 200 mg group and 1.5% in the placebo group.

A greater than 50% reduction in insulin was achieved by 51% of patients on 200 mg and 70% on 400 mg once daily as compared to 17% on placebo.

**Monotherapy**

Three clinical trials, including 2 placebo-controlled studies with durations from 12 to 26 weeks have been conducted to study the use of Rezulin as monotherapy. These studies have examined Rezulin doses from 100 to 600 mg/day in approximately 1600 patients. The patients studied here included patients previously treated with a sulfonylurea who were studied following prior therapy washout (N=1256) and patients previously treated with diet only (N=232). In patients previously treated with a sulfonylurea, Rezulin treatment did not result in an improvement in glycemic control beyond that seen with the patients' prior therapy, although glucose lowering was significantly better than that seen with placebo treatment. For patients previously treated with diet, Rezulin doses of 200 mg, 400 mg and 600 mg/day were associated with improved FSG compared to placebo. However, only the 600 mg/day dose resulted in a difference compared with placebo that was statistically significant in both studies (see Table 5). At 600 mg per day, 58% of patients previously treated with diet in the 12-week study and 47% of patients previously treated with diet in the 26-week study (versus placebo values of 28% and 21%, respectively) had a response to Rezulin of ≥ 30 mg/dL reduction from baseline in fasting serum glucose.

**TABLE 5. Glycemic Parameters in Diet-Failure Patients**

| | | 12 Week Study | | |
|---|---|---|---|---|
| | Placebo | 200 | 400 | 600 |
| N | 19 | 23 | 20 | 33 |
| FSG (mg/dL) | | | | |
| Mean Baseline | 168 | 169 | 181 | 196 |
| Adjusted Mean Change From Baseline | 14 | -14 | -20 | -38 |
| Adjusted Mean Difference From Placebo | | -31* | -37* | -55* |
| $HbA_{1c}$ (%) | | | | |
| Mean Baseline | 8 | 8.2 | 8.6 | 8.6 |
| Adjusted Mean Change From Baseline | -0.1 | -0.6 | -0.6 | -0.8 |
| Adjusted Mean Difference From Placebo | | -0.5 | -0.6 | -0.7* |

| | | 26 Week Study | | |
|---|---|---|---|---|
| | Placebo | 200 | 400 | 600 |
| N | 18 | 18 | 19 | 15 |
| FSG (mg/dL) | | | | |
| Mean Baseline | 202 | 191 | 201 | 201 |
| Adjusted Mean Change From Baseline | -6 | -34 | -17 | -45 |

**INDICATIONS AND USAGE**

Rezulin may be used concomitantly with a sulfonylurea or insulin to improve glycemic control. Rezulin, as monotherapy, is indicated as an adjunct to diet and exercise to lower blood glucose in patients with type II diabetes (see DOSAGE AND ADMINISTRATION). Rezulin should not be used as monotherapy in patients previously well-controlled on sulfonylurea therapy. For patients inadequately controlled with a sulfonylurea alone, Rezulin should be added to, not substituted for, the sulfonylurea.

Management of type II diabetes should include diet control. Caloric restriction, weight loss, and exercise are essential for the proper treatment of the diabetic patient. This is important not only in the primary treatment of type II diabetes, but in maintaining the efficacy of drug therapy. Prior to initiation of Rezulin therapy, secondary causes of poor glycemic control, e.g, infection of poor injection technique, should be investigated and treated.

**CONTRAINDICATIONS**

Rezulin is contraindicated in patients with known hypersensitivity or allergy to Rezulin or any of its components.

**WARNINGS**

SEE BOXED WARNING.

**PRECAUTIONS**

**General**

Because of its mechanism of action, Rezulin is active only in the presence of insulin. Therefore, Rezulin should not be used in type I diabetes or for the treatment of diabetic ketoacidosis.

Hypoglycemia: Patients receiving Rezulin in combination with insulin or oral hypoglycemic agents may be at risk for hypoglycemia and a reduction in the dose of concomitant agent may be necessary. Hypoglycemia has not been observed during the administration of Rezulin as monotherapy, and would not be expected based on the mechanism of action.

Ovulation: In premenopausal anovulatory patients with insulin resistance, Rezulin treatment may result in resumption of ovulation. These patients may be at risk for pregnancy.

Hematologic: Across all clinical studies, hemoglobin declined by 3 to 4% in troglitazone-treated patients compared with 1 to 2% in those treated with placebo. White blood cell counts also declined slightly in troglitazone-treated patients compared to those treated with placebo. These changes occurred within the first four to eight weeks of therapy. Levels stabilized and remained unchanged for up to two years of continuing therapy. These changes may be due to the dilutional effects of increased plasma volume and have not been associated with any significant hematologic/clinical effects (see ADVERSE REACTIONS, Laboratory Abnormalities).

**Use in Patients With Heart Failure**

Heart enlargement without microscopic changes has been observed in rodents at exposures of parent compound and active metabolite exceeding 7 times the AUC of the 400 mg human dose (see PRECAUTIONS, Carcinogenesis, Mutagenesis, Impairment of Fertility, and Animal Toxicology).

Continued on next page

**TABLE 4. Combination Therapy with Insulin: Mean Change From Baseline at 6 Months**

| Parameter | Placebo | Troglitazone 200 mg | 600 mg |
|---|---|---|---|
| N | 118 | 116 | |
| $HbA_{1c}$ (%) | | | |
| Mean Baseline (SE) | 9.43 (0.10) | 9.51 (0.10) | |
| Adjusted Mean Change From Baseline | -0.12 (0.10) | -0.84 (0.10) | |
| Adjusted Mean Difference From Placebo (SE) | | -0.72 (0.14)* | |
| Percent Mean Change From Baseline | -1 | -9 | |
| Insulin daily dosage (units) | | | |
| Mean Baseline | 78 (3.2) | 73 (3.4) | |
| Mean Change From Baseline (SE) | -2 (2.1) | -11 (2.2) | |
| Adjusted Mean Difference From Placebo (SE) | | -9 | |
| Percent Mean Change From Baseline | -2 | -15 | |

*p ≤0.0001

†Least squares mean adjusted for investigator center and baseline

A232/PARKE-DAVIS

Rezulin—Cont.

Serial echocardiographic evaluations in monkeys treated chronically at exposures at 4–8 times the human exposure to parent compound and active metabolite at the 400 mg dose did not reveal changes in heart size or function. In a 2-year echocardiographic clinical study using 800 to 800 mg/day of Rezulin in patients with type II diabetes, no increase in left ventricular mass or decrease in cardiac output was observed. The methodology employed was able to detect a change of about 10% or more in left ventricular mass. In animal studies, troglitazone treatment was associated with increases of 6% to 15% in plasma volume. In a study of 24 normal volunteers, an increase in plasma volume of 6% to 8% compared to placebo was observed following 6 weeks of troglitazone treatment.

No increased incidence of adverse events potentially related to volume expansion (eg, congestive heart failure) have been observed during controlled clinical trials. However, patients with New York Heart Association (NYHA) Class III and IV cardiac status were not studied during clinical trials. Therefore, Rezulin is not indicated unless the expected benefit is believed to outweigh the potential risk to patients with NYHA Class III or IV cardiac status.

**Information for Patients**

Rezulin should be taken with meals. If the dose is missed at the usual meal, it may be taken at the next meal. If the dose is missed on one day, the dose should not be doubled the following day.

It is important to adhere to dietary instructions and to regularly have blood glucose and glycosylated hemoglobin tested. During periods of stress such as fever, trauma, infection, or surgery, insulin requirements may change and patients should seek the advice of their physician.

Patients who develop nausea, vomiting, abdominal pain, fatigue, anorexia, dark urine or other symptoms suggestive of hepatic dysfunction or jaundice should immediately report these signs or symptoms to their physician.

When using combination therapy with insulin or oral hypoglycemic agents, the risks of hypoglycemia, its symptoms and treatment, and conditions that predispose to its development should be explained to patients and their family members.

Use of Rezulin can cause resumption of ovulation in women taking oral contraceptives and in patients with polycystic ovary disease. Therefore, a higher dose of an oral contraceptive or an alternative method of contraception should be considered.

Rezulin may affect other medications used in diabetic patients. Patients started on Rezulin should ask their physician to review their other medications to make sure that they are not affected by Rezulin.

**Drug Interactions**

Oral Contraceptives: Administration of Rezulin with an oral contraceptive containing ethinyl estradiol and norethindrone reduced the plasma concentrations of both by approximately 30%, which could result in loss of contraception. Therefore, a higher dose of oral contraceptive or an alternative method of contraception should be considered.

Terfenadine: Coadministration of Rezulin with terfenadine decreases the plasma concentration of both terfenadine and its active metabolite by 50–70% and may result in decreased efficacy of terfenadine.

Cholestyramine: Concomitant administration of cholestyramine with Rezulin reduces the absorption of troglitazone by 70%; thus, coadministration of cholestyramine and Rezulin is not recommended.

Glyburide: Coadministration of Rezulin and glyburide does not appear to alter troglitazone or glyburide pharmacokinetics.

Digoxin: Coadministration of Rezulin with digoxin does not alter the steady-state pharmacokinetics of digoxin.

Warfarin: Rezulin has no clinically significant effect on prothrombin time when administered to patients receiving chronic warfarin therapy.

Acetaminophen: Coadministration of acetaminophen and Rezulin does not alter the pharmacokinetics of either drug.

Metformin: No information is available on the use of Rezulin with metformin.

Ethanol: A single administration of a moderate amount of alcohol did not increase the risk of acute hypoglycemia in Rezulin-treated patients with type II diabetes mellitus.

The above interactions with terfenadine and oral contraceptives suggest that troglitazone may induce drug metabolism by CYP3A4. Studies have not been performed with other drugs metabolized by this enzyme such as astemizole, calcium channel blockers, cisapride, corticosteroids, cyclosporine, HMG-CoA reductase inhibitors, tacrolimus, triazolam, and triamterene. The possibility of altered safety and efficacy should be considered when Rezulin is used concomi-

**Carcinogenesis, Mutagenesis, Impairment of Fertility**

Troglitazone was administered daily for 104 weeks to male rats at 100, 400, or 800 mg/kg and to female rats at 25, 50, or 200 mg/kg. No tumors of any type were increased at the low and mid doses. Plasma drug exposure based on AUC of parent compound and total metabolites at the low and mid doses was up to 2–6 fold higher than human exposure at 400 mg daily. The highest dose in each sex exceeded the maximum tolerated dose. In a 104-week study in mice given 50, 400, or 800 mg/kg, incidence of hemangiosarcoma was increased in females at 400 mg/kg and in both sexes at 800 mg/kg; incidence of hepatocellular carcinoma was increased in females at 800 mg/kg. The lowest dose associated with increased tumor incidence (400 mg/kg) was associated with AUC values of parent compound and total metabolites that were at least 2-fold higher than the human exposure at 400 mg daily. No tumors of any type were increased in mice at 50 mg/kg at exposures up to 40% of that in humans at 400 mg daily, based on AUC of parent compound and total metabolites.

Troglitazone was neither mutagenic in bacteria nor clastogenic in bone marrow of mice. Equivocal increases in chromosome aberrations were observed in an in vitro Chinese hamster lung cell assay. In mouse lymphoma cell gene mutation assays, results were equivocal when conducted with a microtiter technique and negative with an agar plate technique. A liver unscheduled DNA synthesis assay in rats was negative.

No adverse effects on fertility or reproduction were observed in male or female rats given 40, 200, or 1000 mg/kg daily prior to and throughout mating and gestation. AUC of parent compound at these doses was estimated to be 3– to 9-fold higher than the human exposure.

**Animal Toxicology**

Increased heart weights without microscopic changes were observed in mice and rats treated for up to 1 year at exposure (AUC) of parent and active metabolite exceeding 7 times the human AUC at 400 mg/day. These heart weight increases were reversible in 2- and 13-week studies, were prevented by coadministration of an ACE inhibitor, and in days of troglitazone administration in rats did not affect left ventricular performance. In the lifetime carcinogenicity studies, microscopic changes were noted in the hearts of rats but not mice. In control and treated rats, microscopic changes included myocardial inflammation and fibrosis and karyomegaly of atrial myocytes. The incidence of these changes in drug-treated rats was increased compared to controls at twice the AUC of the 400 mg human dose.

**Pregnancy**

Pregnancy Category B. Troglitazone was not teratogenic in rats given up to 2000 mg/kg or rabbits given up to 1000 mg/kg during organogenesis. Compared to human exposure of 400 mg daily estimated exposures in rats (parent compound) and rabbits (parent compound and active metabolites) based on AUC at these doses were up to 9-fold and 3-fold higher, respectively. Body weights of fetuses and offspring of rats given 2000 mg/kg during gestation were decreased. Delayed postnatal development, attributed to decreased body weight, was observed in offspring of rats given 40, 200, or 1000 mg/kg during late gestation and lactation periods; no effects were observed in offspring of rats given 10 or 20 mg/kg.

There are no adequate and well-controlled studies in pregnant women. Rezulin should not be used during pregnancy unless the potential benefit justifies the potential risk to the fetus.

Because current information strongly suggests that abnormal blood glucose levels during pregnancy are associated with a higher incidence of congenital anomalies as well as increased neonatal morbidity and mortality, most experts recommend that insulin be used during pregnancy to maintain blood glucose levels as close to normal as possible.

**Nursing Mothers**

It is not known whether troglitazone is secreted in human milk. Troglitazone is secreted in the milk of lactating rats. Because many drugs are excreted in human milk, Rezulin

**Geriatric Use**

Twenty-two percent of patients in clinical trials of Rezulin were 65 and over. No differences in effectiveness and safety were observed between these patients and younger patients.

**ADVERSE REACTIONS**

Two patients in the clinical studies developed reversible jaundice; one of these patients had a liver biopsy which was consistent with an idiosyncratic drug reaction. An additional patient had a liver biopsy which was also consistent with an idiosyncratic drug reaction. Symptoms that are associated with hepatic dysfunction have been reported, including: nausea, vomiting, abdominal pain, fatigue, anorexia, dark urine, abnormal liver function tests (including increased ALT, AST, LDH, alkaline phosphatase, bilirubin). Also see WARNINGS.

The overall incidence and types of adverse reactions reported in placebo-controlled clinical trials for Rezulin-treated patients and placebo-treated patients are shown in Table 6. In patients treated with Rezulin in glyburide-controlled studies (N=550) or uncontrolled studies (N=410), the safety profile of Rezulin appeared similar to that displayed in Table 6. The incidence of withdrawals during clinical trials was similar for patients treated with placebo or Rezulin (4%).

(See table above)

Types of adverse events seen when Rezulin was used concomitantly with insulin (N=543) were similar to those during Rezulin monotherapy (n=1731), although hypoglycemia occurred in insulin combination therapy (see PRECAUTIONS).

**Laboratory Abnormalities**

Hematologic: Small decreases in hemoglobin, hematocrit and neutrophil counts (within the normal range) were more common in Rezulin-treated than placebo-treated patients and may be related to increased plasma volume observed with Rezulin treatment. Hemoglobin decreases to below the normal range occurred in 5% of Rezulin-treated, and 4% of placebo-treated patients.

Lipids: Small changes in serum lipids have been observed (see CLINICAL PHARMACOLOGY, Pharmacodynamics and Clinical Effects).

Serum Transaminase Levels: During all clinical studies in North America, a total of 48 of 2510 (1.9%) Rezulin-treated patients and 3 of 475 (0.6%) placebo-treated patients had ALT levels greater than 3 times the upper limit of normal. During controlled clinical trials, 2.2% of Rezulin-treated patients had reversible elevations in AST or ALT greater than 3 times the upper limit of normal, compared with 0.6% of patients receiving placebo. Hyperbilirubinemia (>1.5) upper limit of normal) was found in 0.7% of Rezulin-treated patients compared with 1.7% of patients receiving placebo. In the population of patients treated with Rezulin, mean and median values for bilirubin, AST, ALT, alkaline phosphatase, and GGT were decreased at the final visit compared with baseline, while values for LDH were increased slightly (see WARNINGS).

**Postintroduction Reports**

Events associated with Rezulin that have been reported since market introduction, that are not listed above, and for which causal relationship to drug has not been established include the following: congestive heart failure, weight gain, edema, fever, abnormal lab tests including increased CPK and creatinine, hyperglycemia, syncope, anemia, malaise.

**DOSAGE AND ADMINISTRATION**

Rezulin should be taken with a meal.

**Combination Therapy**

Sulfonylureas: Rezulin in combination with a sulfonylurea should be initiated at 200 mg once daily. The current sulfonylurea dose should be continued upon initiation of Rezulin therapy. For patients not responding adequately, the Rezulin dose should be increased at 2 to 4 weeks. The maximum recommended dose is 600 mg once daily. The dose of sulfonylurea may require lowering to optimize therapy.

Insulin: The current insulin dose should be continued upon initiation of Rezulin therapy. Rezulin therapy should be ini-

### TABLE 6. North American Placebo-Controlled Clinical Studies: Adverse Events Reported at a Frequency ≥ 5% of Rezulin-Treated Patients, % of Patients

| | Placebo N = 492 | Rezulin N = 1450 | | Placebo N = 492 | Rezulin N = 1450 |
|---|---|---|---|---|---|
| Infection | 22 | 18 | Nausea | 4 | 5 |
| Headache | 11 | 11 | Rhinitis | 7 | 6 |
| Pain | 14 | 10 | Diarrhea | 5 | 6 |
| Accidental Injury | 6 | 6 | Urinary Tract Infection | 5 | 6 |
| Asthenia | 5 | 6 | Peripheral Edema | 5 | 6 |
| Dizziness | 5 | 6 | Pharyngitis | 4 | 6 |
| Back Pain | 4 | 6 | | | |

recommended daily dose is 600 mg. It is recommended that the insulin dose be decreased by 10% to 25% when fasting plasma glucose concentrations decrease to less than 120 mg/dL in patients receiving concomitant insulin and Rezulin. Further adjustments should be individualized based on glucose-lowering response.

**Monotherapy:**

Rezulin monotherapy in patients not adequately controlled with diet alone should be initiated at 400 or 600 mg once daily. For patients not responding to 400 mg once daily, the Rezulin dose should be increased to 600 mg after 6-8 weeks. For patients not responding adequately to 600 mg after 6-8 weeks, Rezulin should be discontinued and alternative therapeutic options should be pursued. See CLINICAL PHARMACOLOGY, Clinical Studies, Monotherapy.

**Patients With Renal Insufficiency**

Dose adjustment in patients with renal insufficiency is not required (see CLINICAL PHARMACOLOGY, Pharmacokinetics and Drug Metabolism). Out of 2936 patients, 148 (5%) had a serum creatinine ≥ 1.5 at baseline. Of these 148 patients, 145 had creatinine levels between 1.5 and 2.0, inclusive, only 3 patients had levels >2.0. No consistent trend was seen in any of these adverse events, and no worsening of renal insufficiency was observed.

**Patients With Hepatic Impairment**

Rezulin therapy should not be initiated if the patient exhibits clinical or laboratory evidence of active liver disease (eg, ALT>3 times the upper limit of normal). See CLINICAL PHARMACOLOGY, Special Populations, Hepatic Insufficiency, and WARNINGS.

**HOW SUPPLIED**

Rezulin is available in 200, 300 and 400 mg tablets as follows:

200 mg Tablets: Yellow, oval, non-scored, film-coated tablet with "PD 352" debossed on one side, and "200" on the other, available in:

N 0071-0352-15 Bottles of 20
N 0071-0352-23 Bottles of 90
N 0071-0352-40 (10 × 10 unit-dose blisters)

300 mg Tablets: White, oval, non-scored, film-coated tablet with "PD 357" debossed on one side and "300" on the other, available in:

N 0071-0357-20 Bottles of 60
N 0071-0357-23 Bottles of 90
N 0071-0357-40 (10 × 10 unit-dose blisters)

400 mg Tablets: Tan, oval, non-scored, film-coated tablet with "PD 353" debossed on one side, and "400" on the other, available in:

N 0071-0353-15 Bottles of 30
N 0071-0353-23 Bottles of 90
N 0071-0353-40 (10 × 10 unit-dose blisters)

**Storage**

Store at controlled room temperature 20°C–25°C (68°F–77°F). Protect from moisture and humidity.

Caution: Federal law prohibits dispensing without prescription.

©1997, Warner-Lambert Co.

December 1997

Manufactured by:

Parke Davis Pharmaceuticals, Ltd.

Vega Baja, PR 00694

For:

PARKE-DAVIS

Div of Warner-Lambert Co

Morris Plains, NJ 07950 USA

Marketed by:

PARKE-DAVIS

Div of Warner-Lambert Co and

SANKYO PARKE DAVIS

Parsippany, NJ 07054 USA

0352G202

To keep your PDR up to date throughout the year, note these revisions on the corresponding pages of the annual volume. Simply write "See Supplement A" next to the product heading.

---

**Pfizer Inc**

235 EAST 42nd STREET

NEW YORK, NY 10017-5755.

**ARICEPT**

(Donepezil Hydrochloride Tablets)                                                          R

Prescribing information for this product, which appears on pages 2161-2164 of the 1998 PDR, has been completely revised as follows. Please write "See Supplement A" next to the product heading.

**DESCRIPTION**

ARICEPT (donepezil hydrochloride) is a reversible inhibitor of the enzyme acetylcholinesterase, known chemically as (±)-2,3-dihydro-5,6-dimethoxy-2-[[1-(phenylmethyl)-4-piperidinyl]methyl]-1H-inden-1-one hydrochloride. Donepezil hydrochloride is commonly referred to in the pharmacological literature as E2020. It has an empirical formula of C₂₄H₂₉NO₃·HCl and a molecular weight of 415.96. Donepezil hydrochloride is a white crystalline powder and is freely soluble in chloroform, soluble in water and in glacial acetic acid, slightly soluble in ethanol and in acetonitrile and practically insoluble in ethyl acetate and in n-hexane.

ARICEPT is available for oral administration in film-coated tablets containing 5 or 10 mg of donepezil hydrochloride. Inactive ingredients are lactose monohydrate, corn starch, microcrystalline cellulose, hydroxypropyl cellulose, and magnesium stearate. The film coating contains talc, polyethylene glycol, hydroxypropyl methylcellulose, and titanium dioxide. Additionally, the 10 mg tablet contains yellow iron oxide (synthetic) as a coloring agent.

**CLINICAL PHARMACOLOGY**

Current theories on the pathogenesis of the cognitive signs and symptoms of Alzheimer's Disease attribute some of them to a deficiency of cholinergic neurotransmission. Donepezil hydrochloride is postulated to exert its therapeutic effect by enhancing cholinergic function. This is accomplished by increasing the concentration of acetylcholine through reversible inhibition of its hydrolysis by acetylcholinesterase. If this proposed mechanism of action is correct, donepezil's effect may lessen as the disease process advances and fewer cholinergic neurons remain functionally intact. There is no evidence that donepezil alters the course of the underlying dementing process.

**Clinical Trial Data**

The effectiveness of ARICEPT as a treatment for Alzheimer's Disease is demonstrated by the results of two randomized, double-blind, placebo-controlled clinical investigations in patients with Alzheimer's Disease (diagnosed by NINCDS and DSM III-R criteria, Mini-Mental State Examination ≥ 10 and ≤ 26 and Clinical Dementia Rating of 1 or 2). The mean age of patients participating in ARICEPT trials was 73 years with a range of 50 to 94. Approximately 62% of patients were women and 38% were men. The racial distribution was white 95%, black 3% and other races 2%.

**Study Outcome Measures:** In each study, the effectiveness of treatment with ARICEPT was assessed using a dual outcome assessment strategy.

The ability of ARICEPT to improve cognitive performance was assessed with the cognitive subscale of the Alzheimer's Disease Assessment Scale (ADAS-cog), a multi-item instrument that has been extensively validated in longitudinal cohorts of Alzheimer's Disease patients. The ADAS-cog examines selected aspects of cognitive performance including elements of memory, orientation, attention, reasoning, language and praxis. The ADAS-cog scoring range is from 0 to 70, with higher scores indicating greater cognitive impairment. Elderly normal adults may score as low as 0 or 1, but it is not unusual for non-demented adults to score slightly higher.

The patients recruited as participants in each study had mean scores on the Alzheimer's Disease Assessment Scale (ADAS-cog) of approximately 26 units, with a range from 4 to 61. Experience gained in longitudinal studies in ambulatory patients with mild to moderate Alzheimer's Disease suggest that they gain 6 to 12 units a year on the ADAS-cog. However, lesser degrees of change are seen in patients with very mild or very advanced disease because the ADAS-cog is not uniformly sensitive to change over the course of the disease. The annualized rate of decline in the placebo patients participating in ARICEPT trials was approximately 2 to 4 units per year.

The ability of ARICEPT to produce an overall clinical effect was assessed using a Clinician's Interview Based Im-

---

pression of Change that required the use of caregiver information, the CIBIC plus. The CIBIC plus is not a single instrument and is not a standardized instrument like the ADAS-cog. Clinical trials for investigational drugs have used a variety of CIBIC formats, each different in terms of depth and structure. As such, results from a CIBIC plus reflect clinical experience from the trial or trials in which it was used and can not be compared directly with the results of CIBIC plus evaluations from other clinical trials. The CIBIC plus used in ARICEPT trials was a semi-structured instrument that was intended to examine four major areas of patient function: General, Cognitive, Behavioral and Activities of Daily Living. It represents the assessment of a skilled clinician based upon his/her observations at an interview with the patient, in combination with information supplied by a caregiver familiar with the behavior of the patient over the interval rated. The CIBIC plus is scored as a seven point categorical rating, ranging from a score of 1, indicating "markedly improved," to a score of 4, indicating "no change" to a score of 7, indicating "markedly worse." The CIBIC plus has not been systematically compared directly to assessments not using information from caregivers (CIBIC) or other global methods.

**Thirty-Week Study**

In a study of 30 weeks duration, 473 patients were randomized to receive single daily doses of placebo, 5 mg/day or 10 mg/day of ARICEPT®. The 30-week study was divided into a 24-week double-blind active treatment phase followed by a 6-week single-blind placebo washout period. The study was designed to compare 5 mg/day or 10 mg/day fixed dose of ARICEPT to placebo. However, to reduce the likelihood of cholinergic effects, the 10 mg/day treatment was started following an initial 7-day treatment with 5 mg/day doses.

**Effects on the ADAS-cog:** Figure 1 illustrates the time course for the change from baseline in ADAS-cog scores for all three dose groups over the 30 weeks of the study. After 24 weeks of treatment, the mean differences in the ADAS-cog change scores for ARICEPT treated patients compared to the patients on placebo were 2.8 and 3.1 units for the 5 mg/day and 10 mg/day treatments, respectively. These differences were statistically significant. While the treatment effect size may appear to be slightly greater for the 10 mg/day treatment, there was no statistically significant difference between the two active treatments.

Following 6 weeks of placebo washout, scores on the ADAS-cog for both the ARICEPT® treatment groups were indistinguishable from those patients who had received only placebo for 30 weeks. This suggests that the beneficial effects of ARICEPT® abate over 6 weeks following discontinuation of treatment and do not represent a change in the underlying disease. There is no evidence of a rebound effect 6 weeks after abrupt discontinuation of therapy.



Figure 1. Time-course of the Change from Baseline in ADAS-cog Score for Patients Completing 24 Weeks of Treatment.

Figure 2 illustrates the cumulative percentages of patients from each of the three treatment groups who had attained the measure of improvement in ADAS-cog score shown on the X axis. Three change scores, (7-point and 4-point reductions from baseline or no change in score) have been identified for illustrative purposes and the percent of patients in each group achieving that result is shown in the inset table. The curves demonstrate that both patients assigned to placebo and ARICEPT have a wide range of responses, but that the active treatment groups are more likely to show the greater improvements. A curve for an effective treatment would be shifted to the left of the curve for placebo, while an ineffective or deleterious treatment would be superimposed upon or shifted to the right of the curve for placebo, respectively.

(See Figure 2 on top of next column)

**Effects on the CIBIC plus:** Figure 3 is a histogram of the frequency distribution of CIBIC plus scores attained by patients assigned to each of the three treatment groups who completed 24 weeks of treatment. The mean drug-placebo differences for these groups of patients were 0.36 units and 0.39 units for 5 mg/day and 10 mg/day of ARICEPT®, respectively. These differences were statistically significant. There was no statistically significant difference between the two active treatments.

(See Figure 3 in next column)

Continued on next page

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
ENTERED

JAN 1 7 2001

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| ROSARIO HERNANDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| PFIZER, INC., WARNER-LAMBERT | § | CIVIL ACTION NO. C-00-459 |
| COMPANY, now known as PFIZER, | § | |
| INC., H.E. BUTT GROCERY | § | |
| COMPANY, also doing business as | § | |
| H.E.B., INC., and H.E.B. FOOD | § | |
| STORES, INC., | § | |
| | § | |
| Defendants. | § | |

## ORDER OF REMAND

Pending before the Court is Plaintiff's Amended Motion for
Remand to State Court.  For the reasons set forth herein, the
Court grants the motion.

## I. JURISDICTION

The Court does not have jurisdiction over this action.

## II. FACTS

This is a Rezulin case.  Plaintiff filed this case in the
229th Judicial District Court of Duval County, Texas against
Pfizer, Inc., Warner-Lambert Company, (collectively, "Pfizer"),
H.E. Butt Grocery Company, also doing business as H.E.B. Inc.,
and H.E.B. Food Stores, Inc. (collectively, "HEB").  Plaintiff
originally sued Pfizer and her physician; she subsequently

dismissed all claims against the physician, but added HEB.  She
asserted strict liability and breach of warranty claims against
both HEB and Pfizer.  She also asserted various state law claims
against Pfizer alone.

Pfizer removed this action, alleging diversity
jurisdiction.[1]  Pfizer asserts that Warner-Lambert Company is a
Delaware corporation with its principal place of business in
Morris Plains, New Jersey; that Pfizer Inc. is a Delaware
corporation with its principal place of business in New York, New
York; and that HEB (under all names by which Plaintiff sued it)
is a Texas corporation with its principal place of business in
San Antonio, Bexar County, Texas.  Pfizer argues, however, that
HEB should be disregarded for diversity purposes because it was
fraudulently joined for the sole purpose of defeating diversity
jurisdiction.  Plaintiff has moved to remand, contesting that
there is no showing that HEB was fraudulently joined.

The Court agrees with Plaintiff.

Pfizer also has requested, in its response to Plaintiff's
motion to remand, that this Court defer ruling on the motion to

_____

[1]The parties dispute whether the removal was timely.
Because the Court finds that the case should be remanded on other
grounds, it does not reach this issue.

2

remand pending transfer of this case to the Rezulin MDL

proceeding. The Court will deny the request.

## III. DISCUSSION

### Removal and Fraudulent Joinder

In general, an action is removable to a federal court only

if it might have been brought there originally. See, 28 U.S.C. §

1441(a); Avitts v. Amoco Production Co., 53 F.3d 690, 693 (5th

Cir. 1995). The principles governing federal question

jurisdiction, diversity of citizenship jurisdiction, and the

jurisdictional amount are therefore applicable to removal. 14A

Wright, Miller & Cooper, Federal Practice and Procedure § 3721

(2d ed. 1985). Federal law determines whether the elements of

removal jurisdiction have been satisfied. Id.

When a defendant seeks to remove a case, the question of

whether jurisdiction exists is resolved by looking at the

complaint at the time the petition for removal is filed. See,

Pullman Co. v. Jenkins, 305 U.S. 534, 537-38, 59 S. Ct. 347, 348-

49 (1939); Miranti v. Lee, 3 F.3d 925, 928 (5th Cir. 1993); Brown

v. Southwestern Bell Tel. Co., 901 F.2d 1250, 1254 (5th Cir.

1990); Idoux v. Lamar Univ. Sys., 817 F. Supp. 637, 642 (E.D.

Tex. 1993).

3

A case in which complete diversity of citizenship does not exist may be removed when the defendants establish that the non-diverse defendants have been fraudulently joined. "The removing party bears the heavy burden of proving that non-diverse defendants have been fraudulently joined to defeat diversity, either by showing that (1) there has been outright fraud in the plaintiff's recitation of jurisdictional facts, or (2) there is no possibility that the plaintiff would be able to establish a cause of action against the non-diverse defendants in state court." Burden v. General Dynamics Corp., 60 F.3d 213, 217 (5th Cir. 1995); Jernigan v. Ashland Oil Co., 989 F.2d 812, 815 (5th Cir. 1993); B., Inc. v. Miller Brewing Co., 663 F.2d 545 (5th Cir. 1981). Pfizer does not claim that Plaintiff has committed outright fraud in the recitation of jurisdictional facts; instead, the Court must decide whether there is any possibility that the plaintiff would be able to establish a cause of action against the non-diverse defendant in state court.

"The motive of the plaintiff in joining a defendant is immaterial, provided that the plaintiff asserts the cause of action in good faith, upon a reasonable basis grounded in state law." Higgins v. Pittsburgh-Des Moines Co., 635 F. Supp. 1182, 1184 (S.D. Tex. 1986); Dollar v. General Motors Corp., 814 F.

4

Supp. 538, 541 (E.D. Tex. 1993). Thus, even if Plaintiff added

HEB for the purpose of defeating diversity, as long as there is a

good faith claim against HEB, diversity is lacking and the suit

should be remanded to state court.

The Court must look at the claims in the live pleading at

the time of removal, therefore, to determine essentially whether

Plaintiff has stated a claim for which relief may be granted

against HEB. Plaintiff's second amended petition states two

claims against HEB:

> ". . .HEB sold Rezulin (Troglitazone) in the
> course of [its] business. Rezulin (Troglitazone) was
> then in a defective condition and unreasonably
> dangerous when put to a reasonably anticipated use. It
> was then known to these defendants that this drug would
> cause severe liver damage or even death to its users.
> . . .
> "Such defective condition as existed when the drug
> Rezulin (Troglitazone) was sold by the defendants was a
> producing cause of [Plaintiff's damages.] . . ."

Plaintiff's Second Amended Petition at 5-6. Plaintiff further

alleges:

> "Defendants Warner-Lambert, Pfizer and HEB designed,
> manufactured, produced, labeled, advertised, marketed,
> tested, inspected, shipped, distributed, and/or sold
> the drug Rezulin (Troglitazone) in the course of their
> business. The drug Rezulin (Troglitazone) was in a
> defective condition and unreasonably dangerous when put
> to its reasonably anticipated use in that the above-
> named defendants failed to warn or properly and
> adequately notify, inform, or warn prescribers and
> consumers of its dangers. . .

5

> . . .
> "Such defective conditions and the lack of warnings or
> adequate warnings as existed when the drug Rezulin
> (Troglitazone) was sold by the defendants were a
> producing cause of [Plaintiff's damages.] . . ."

Plaintiff's Second Amended Petition at 7-8.  Finally, Plaintiff

alleges that HEB, along with Pfizer, breached an implied warranty

of fitness for a particular purpose and an implied warranty of

merchantability by selling a drug that was not fit for human

consumption.  As long as Plaintiff could conceivably recover

damages from HEB under one of these causes of action, the case

must be remanded.

In order to recover under the theory of strict products

liability a Plaintiff must establish (1) the defective and

unreasonably dangerous condition of the defendant's product; and

(2) a causal connection between such condition and the

plaintiff's injuries or damages.  <u>Lucas & Texas Indus., Inc.</u>, 696

S.W.2d 372, 377 (Tex. 1984).  A strict liability claim in Texas

is premised upon section 402A of the Restatement of Torts, 2d.[2]

---

[2] Section 402A of the Restatement of Torts 2d provides as
follows:
> (1) One who sells any product in a defective condition
> unreasonably dangerous to the user or consumer or to his
> property is subject to liability for physical harm thereby
> caused to the ultimate user or consumer, or to his property,
> if
>> (a) the seller is engaged in the business of selling

6

<u>Nobility Homes of Texas, Inc. v. Shivers</u>, 557 S.W.2d 77, 70-80 (Tex. 1977).

Under Texas law, a retailer is liable to a consumer for damages caused by the unreasonably dangerous products it sells, even though the retailer has no means of knowing that the product is unfit for human consumption. <u>Griggs Canning Co. v. Josey</u>, 164 S.W.2d 835, 840 (Tex. 1942) (holding, under theory of implied warranty imposed by public policy, that food retailer is liable to consumer for unreasonably dangerous food, even though "the food is in sealed containers and bears the label of the manufacturer and the retailer has no means of knowing that the contents are unfit for human consumption"). *See also* <u>Ford Motor Co. v. Gonzalez</u>, 9 S.W.3d 195 (Tex. App. – San Antonio 1999, no writ history); <u>Torres v. Caterpillar</u>, 928 S.W.2d 233 (Tex. App. – San Antonio 1996, writ denied); <u>Lubbock Mfg. Co. v. International Harvester Co.</u>, 584 S.W.2d 908, 913 (Tex. Civ. App. – 1979, writ

---

       such a product, and
       (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
       (a) the seller has exercised all possible care in the preparation and sale of his product, and
       (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

7

ref'd n.r.e.) (explaining rationale for holding retailer liable

for products that were defectively designed or manufactured).

Plaintiff has alleged that Rezulin is a defective and

unreasonably dangerous drug; that Rezulin caused her damages; and

that HEB sold the drug in the usual course of its business.

These allegations set out a cause of action for strict products

liability in Texas against a retailer. The Court concludes that

Plaintiff has alleged a cause of action against HEB, and this

precludes the Court from finding that HEB was fraudulently

joined.

Pfizer responds, however, that under Texas law, a pharmacy

has no duty to warn a patient of the side effects of a

medication, citing to Morgan v. Wal-Mart Stores, Inc., 30 S.W.3d

455 (Tex. App. - Austin 2000, no writ history).  Morgan v. Wal-

Mart was a negligence case.  The appeals court there held that,

absent specialized circumstances, a pharmacist has no generalized

duty to warn a patient of the side effects of a medication where

the pharmacist accurately fills a valid prescription.  Id. at

469.  This holding is based on the "learned intermediary"

doctrine.  See id. at 461-462; see also McKee v. American Home

Products, 113 Wash.2d 701, 782 P.2d 1045 (1989).  Stated briefly,

the learned intermediary doctrine places the duty to warn about

8

the side effects of medication on the physician, who is in "the best position to 'relate the propensities of the drug to the physical idiosyncrasies of the patient.'" <u>Morgan v. Wal-Mart</u>, 30 S.W.3d at 462 (citing <u>McKee v. American Home Products</u>, 782 P.2d at 1050).

The arguments raised above do considerable damage to any negligence claim that Plaintiff might assert against HEB. But it is irrelevant to Plaintiff's strict products liability claim. Pfizer has not pointed to any Texas case or statutory law that would preclude a pharmacy from being held liable for dispensing a medication that is unreasonably dangerous, as alleged by Plaintiff, and not merely one that has adverse side effects, as was alleged in <u>Morgan v. Wal-Mart</u>.

Pfizer also points to statements at a "Rezulin litigation conference" advising plaintiffs' attorneys how to avoid being drawn into the MDL litigation regarding Rezulin, as evidence that HEB was joined for the sole purpose of defeating diversity. But, as indicated above, as long as HEB could be liable under the allegations in Plaintiff's complaint, her motive in joining HEB does not render the joinder fraudulent. *See* <u>Higgins v.</u>

9

Pittsburgh-Des Moines Co., *supra*; Dollar v. General Motors Corp., *supra*.

Pfizer cites a number of cases from other states that relieve pharmacists from liability for damages caused by medications. Those cases do not help Pfizer's case, however. The case of Batiste v. American Home Prods. Corp., 231 S.E.2d 269 (N.C. App. 1977), for example, is irrelevant because Batiste holds that North Carolina does not recognize strict products liability in retailers, *id.*, 231 S.E.2d at 275, while Texas does, *see* Griggs Canning Co. v. Josey, *supra*. Other cases find on policy grounds that pharmacists should be excluded from strict liability claims. *See, e.g.*, Bichler v. Willing, 58 A.D.2d 331, 397 N.Y.S.2d 57 (N.Y.App. 1977); Coyle v. Richardson-Merrell, Inc., 584 A.2d 1383 (Pa. 1991). Although such cases enunciate compelling reasons for exempting pharmacies from the reach of strict products liability actions, the courts of the State of Texas simply have not issued a similar ruling. In its analysis, this Court must resolve all disputed questions of fact and state law in favor of remand. Dollar v. General Motors Corp., 814 F. Supp. at 541. Without a clear indication that Texas has or would provide pharmacists an exemption from the liability imposed on

10

retailers for strict product liability claims, the Court must

conclude that a pharmacist could be held liable, and thus HEB is

not fraudulently joined.

Finally, Pfizer relies upon comment k to § 402A of the

Restatement (Second) of Torts.  Comment k recognizes an exception

to strict liability for products that cannot be made safe because

of unavoidable adverse side effects; the comment specifically

points to drugs as such a product.[3]  The determination of whether

a product is unavoidably dangerous is a fact question requiring a

weighing of its utility against its inherent risk.  *See* <u>Keene</u>

---

[3]Comment k states, in relevant part, as follows:

Unavoidably unsafe products. There are some products
which, in the present state of human knowledge, are
quite incapable of being made safe for their intended
and ordinary use. These are especially common in the
field of drugs. . . . Such a product, properly
prepared, and accompanied by proper directions and
warning, is not defective, nor is it unreasonably
dangerous. The same is true of many other drugs,
vaccines, and the like, many of which for this very
reason cannot legally be sold except to physicians, or
under the prescription of a physician. . . .  The
seller of such products, again with the qualification
that they are properly prepared and marketed, and
proper warning is given, where the situation calls for
it, is not to be held to strict liability for
unfortunate consequences attending their use, merely
because he has undertaken to supply the public with an
apparently useful and desirable product, attended with
a known but apparently reasonable risk.

11

Corp. v. Yeager, 1994 WL 34159 *3 n. 8 (Tex. App. - Texarkana

1993, no writ); *see also* Cudmore v. Richardson-Merrell, Inc., 398

S.W.2d 640, 645 (Tex. Civ. App. - Dallas 1966, writ ref'd

n.r.e.), *cert. denied*, 385 U.S. 1003, 87 S. Ct. 705 (1967) (jury

instruction proper where it defined "unfit and unmerchantable" as

including qualifying phrase "after weighing utility against

potential danger"; court cited to Restatement (Second) of Torts,

§ 402A, comment k); Reyes v. Wyeth Laboratories, 498 F.2d 1264,

1273-1274 (5th Cir. 1974) (under Texas law, unavoidably unsafe

product would not be exempt from § 402A if it is "so dangerous

that a reasonable man would not sell the product if he knew the

risk involved"). Comment k merely elucidates upon the concept

of "unreasonably dangerous" products, and states that the term

does not include useful products "attended with a known but

apparently reasonable risk." Plaintiff's complaint alleges that

Rezulin was *unreasonably* dangerous.

### MDL Proceeding

A number of Rezulin litigation cases around the country have

been centralized in the Southern District of New York pursuant to

28 U.S.C. § 1407. Pfizer requests that this Court abate any

ruling on Plaintiff's motion to remand pending a decision by the

12

Judicial Panel on Multidistrict Litigation to transfer this case

to the Southern District of New York.   Pfizer points out that

other district courts have stayed proceedings pending a decision

by the Judicial Panel on Multidistrict Litigation.   Pfizer has

not, however, indicated that it has requested the Panel to order

the instant case transferred.

    Because the parties have fully briefed the Court on the

issue of federal jurisdiction, there is no reason to believe that

a transferee court would be a more suitable forum for deciding

the remand motion.   *See* Aetna U.S. Healthcare, Inc. v. Hoechst

Aktiengesellschaft, 54 F.Supp.2d 1042, 1047-1048 (D.Kan. 1999);

*see also* Tortola Restaurants, L.P. v. Kimberly- Clark Corp., 987

F.Supp. 1186, 1188-89 (N.D. Cal. 1997) ("Judicial economy will be

best served by addressing the remand issue [as it] will

facilitate litigation in the appropriate forum.").   The Court

should determine first whether it has jurisdiction, and the Court

finds that it does not.   This case should, therefore, be

remanded.

## IV. CONCLUSION

    In summary, Texas law as it currently stands permits a

retailer of an unreasonably dangerous product to be held liable

under a theory of strict products liability.   No Texas court has

13

enunciated an exception in the case of a pharmacist.  Comment k

to § 402A of the Restatement (Second) of Torts does not provide a

blanket exception for sellers of drugs, but instead sheds light

on when a product is "unreasonably dangerous."  The Court

concludes that HEB may, if Plaintiff is able to prove the

allegations included in her complaint, be held liable; therefore,

HEB is not fraudulently joined.

     The Court finds that diversity of citizenship of the parties

does not exist, and it lacks jurisdiction over this lawsuit.

Accordingly, the Court DENIES Pfizer's request to stay

proceedings pending transfer to the Southern District of New

York, and the Court ORDERS that this case be remanded to the

229th Judicial District Court of Duval County, Texas.

     Signed this ___16th___ day of January 2001.

                                    JANIS GRAHAM JACK
                                    UNITED STATES DISTRICT JUDGE

14

UNITED DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE, DIVISION

| | | |
|---|---|---|
| JUANITA BLANCO; RUBEN GARCIA; | § | |
| NICOLAS RODRIGUEZ; and | § | |
| HERMELINDA QUIROGA, Individually | § | CIVIL ACTION NO. B-03-119 |
| and on Behalf of The Estate of MARIA | § | |
| INEZ RUIZ, | § | |
| Plaintiffs | § | |
| | § | (Removed from the 197th Judicial |
| v. | § | District Court of Willacy County, |
| | § | Texas) |
| PFIZER, INC.; WARNER-LAMBERT | § | |
| COMPANY, now known as PFIZER, INC.; | § | |
| INC.; RAJIV FINGA, M.D.; MARK | § | |
| EDWARDS, M.D.; GEORGE CANTU, | § | |
| M.D.; ALLEN B. SPENCE, M.D.; and | § | JURY DEMANDED |
| WATSON'S CITY DRUG, | § | |
| Defendants | § | |

## ORDER

Regarding the Plaintiffs' Motion for Remand to State Court, on the basis of the

pleadings on file and the evidence presented, the Court finds that this action was

improvidently removed and that this Court is without jurisdiction over this action. The

Court therefore determines that it should remand this action to the 197th Judicial District

Court of Willacy County, Texas. It is, therefore,

**ORDERED** that the Plaintiffs' Motion for Remand to State Court be, and the

same is hereby, **GRANTED.** The costs incurred herein are taxed against the Removing

Defendants.

The Clerk shall send a copy of this Order to all counsel for the parties.

DONE this _____ day of _____, 2003, at Brownsville, Texas.

ANDREW S. HANEN
JUDGE PRESIDING

COPIES TO:

Mr. David Casso
**FLORES, CASSO & PETTITT, L.L.P.**
Post Office Box 2128
McAllen, TX 78505-2128

Mr. Michael T. Gallagher
Mr. John H. Kim
**GALLAGHER, LEWIS, DOWNEY & KIM**
700 Louisiana Street, 40th Floor
Houston, TX 77002

Mr. Jack E. Urquhart
**BEIRNE, MAYNARD & PARSONS, L.L.P.**
1300 Post Oak Blvd., Suite 2500
Houston, TX 77056-3000

Mr. David C. Garza
**GARZA & GARZA, L.L.P.**
680 E. St. Charles, Suite 300
P. O. Box 2025
Brownsville, TX 78522-2025

Ms. Ann P. Watson
**SHEEHY, SERPE & WARE**
500 Two Houston Center
909 Fannin Street
Houston, Texas 77010-1003

Ms. Philipa M. Remington
**STINNETT, THIEBAUD & REMINGTON**
4800 Fountain Place
1445 Ross Avenue
Dallas, Texas 75202